United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 8, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————

No. 03-41026

————————————

UNITED STATES OF AMERICA

                    Plaintiff - Appellee

         v.

JOHN K DAVIS

                    Defendant - Appellant

————————————

Appeal from the United States District Court
for the Eastern District of Texas, Beaumont

————————————

Before REAVLEY, WIENER, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Defendant-Appellant John K. Davis appeals his conviction for bribery, mail fraud, money

laundering, and conspiracy to commit those offenses. Davis raises four issues on appeal. First, Davis

claims that the district court improperly overruled Davis's challenges to the government's allegedly

race-based use of peremptory strikes. Second, he argues that the court inappropriately denied his

motion to dismiss the indictment on the basis of the government's breach of the plea agreement

between Davis and the government. Third, Davis contends that the trial court limited his counsel's

cross-examination of a government witness with regard to that witness's plea agreement in violation

1

of the Confrontation Clause of the Sixth Amendment. Finally, Davis asserts that the trial court improperly denied Davis's motion for mistrial based on the jury's improper consideration of extrinsic evidence.

Having reviewed the record and considered the briefs on appeal, we reject Davis's arguments and affirm his conviction.

## I. BACKGROUND

During Davis's tenure on the city council for the City of Beaumont, Texas, government officials began investigating Davis for his alleged receipt of money in return for favorable city council decisions regarding the regulation of sexually-oriented businesses. During the investigation, the government obtained evidence that Davis and Mayor David Moore had taken bribes from Terry Samuel, a building contractor who had performed work for the City.

After being approached by government agents, Davis agreed to cooperate with the government investigation and signed a plea agreement. Using Davis's information, the government obtained a conviction against Samuel. However, after his conviction, Samuel offered government agents information incriminating Davis in a bribery transaction that Davis had repeatedly denied any knowledge of. Because Davis had not been honest in the statements he gave the government, the government deemed him in breach of his plea agreement and indicted him and Mayor Moore.

On November 26, 2002, after a trial, the jury returned a verdict of guilty against Davis and Moore.

## II. DISCUSSION

### A. Government's Peremptory Strikes

During jury selection, the government used peremptory strikes to remove four of the five

2

African-Americans on the strike panel. Davis and Moore objected to the government's strikes, arguing that they were race-based. After argument by both sides, the district court determined that the government's strikes were not race-based and overruled Davis's objection.

In reviewing the district court's determination, we must give great deference to the district court because "findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993). Thus, we review only for clear error. *Id.*

The Due Process clause of the Fifth Amendment prohibits the use of peremptory strikes on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 84 (1986); *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000). The party challenging a peremptory strike carries the burden of persuasion in proving that the strike was purposefully discriminatory. *Bentley-Smith*, 2 F.3d at 1373. Federal courts address *Batson* challenges under a three-step process. First, the claimant must make a *prima facie* showing that the peremptory challenges were race-based. Second, if the *prima facie* threshold has been met, the burden of production shifts to the party accused of discrimination to articulate race-neutral reasons for the peremptory strikes. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination. *Bentley-Smith,* 2 F.3d at 1373; *Montgomery*, 210 F.3d at 453; *United States v. Wallace*, 32 F.3d 921, 925 (5th Cir. 1994); *see also Batson*, 476 U.S. at 96-98.

Here, the district court applied the proper framework to Davis's *Batson* challenge. First, the court heard the defendants' prima facie challenge to the government's peremptory strikes. Counsel for Davis and Moore argued that, in light of the fact that the government had eliminated eighty percent of the African-Americans on the strike panel and the fact that both Davis and Moore were

3

African-American, the strikes were race-based. Second, the court allowed the government to proffer race-neutral explanations for striking those individuals. The government gave valid race-neutral reasons for striking all four jurors. Juror 14 had answered one of the questions on the *voir dire* questionnaire untruthfully in failing to acknowledge that her son had been convicted of assault. Juror 22 knew both defendants very well. She had attended church with Davis, and her children had gone to school with Davis. Furthermore, she knew one of the defense witnesses. Juror 52 had grown up in Moore's neighborhood and had attended school with Moore's brother, who was a potential witness in the case. Juror 43 was a long-time friend of Moore's and had attended elementary, junior high, and high school with Moore. Defense counsel rebutted by arguing that other jurors had similar connections to the defendants or witnesses but were not stricken. However, the court properly found unpersuasive the defense counsel's argument that the government's proffered reasons were pretextual–each juror stricken could be distinguished from other jurors on the strike panel as having more meaningful connections to the individuals in the case. Thus, the court rejected the defendants' objections. Because we find no clear error in that ruling, we uphold it.

### B. Davis's Plea Agreement

Davis contends that the government breached his plea agreement in indicting him and that, therefore, his indictment should have been dismissed. We reject Davis's argument.

On November 3, 1999, Davis agreed to cooperate with the government in its investigation of the bribery scheme in which city officials were accepting payment for favorable ordinances. The next day, prosecutors executed a "proffer letter" providing that none of Davis's statements made pursuant to the proffer agreement would be used against him in any criminal case, but that the government could pursue any investigative leads suggested by the information provided by Davis.

4

The proffer letter specifically provided that the clause allowing investigation of leads provided by Davis was to "eliminate the necessity for a . . . hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements or other information provided by [Davis] during this 'off the record' proffer or discussion."

Prosecutors debriefed Davis pursuant to his proffer agreement. Davis admitted that he had accepted money for his assistance on matters relating to the regulation of sexually-oriented businesses. He also told prosecutors he had delivered $6,000 in cash to Moore at Samuel's request so that Moore would speak on behalf of Samuel before the City's Small Business Revolving Loan Committee. He did not mention personally receiving any substantial amount of money from Samuel.

On November 5, the government entered into an official plea agreement with Davis. Under that agreement, Davis agreed to plead guilty to one count of bribery and "provide complete and truthful information and testimony." The agreement also provided that failure to do so could render the agreement unenforceable and result in prosecution and use of Davis's statements against him. Finally, the plea agreement stated that it constituted the entire plea agreement, that it superseded any other agreements, and that no other promises had been made between the defendant and the government. At the plea hearing, Davis acknowledged that he had read and fully understood all the terms of the agreement and affirmed that there were no other promises made to him.

During the remainder of the investigation, Davis claimed that he had received no money from Samuel except for "soda water" money, either for his birthday or other special occasions, in the amount of $500 on each occasion, and that he had received insurance commissions on policies taken out by Samuel.

After obtaining subpoenaed bank records from Samuel's bank, agents asked Davis about two

5

cashier's checks that Samuel's bank had issued on Samuel's behalf shortly after he received a loan from the Small Business Revolving Loan Committee. One check was written out to Audwin Samuel for $21,000, and the other to Danny Fowler for $9,000. Despite repeated questioning on several occasions, Davis denied having any knowledge of the two checks and denied ever receiving any part of the money. When confronted with evidence of the $21,000 check, Davis speculated that Samuel sent the money to Audwin Samuel for payment of attorney fees or rent on one of Moore's buildings. Davis later denied knowledge of the check before a grand jury and at trial.

After the jury found Samuel guilty, he decided to cooperate with federal agents. He disclosed that after he had received the loan from the Loan Committee, Davis instructed him to send $30,000 in pay-off money. According to Samuel, Davis instructed him to write out two checks: one for $21,000 to Audwin Samuel for "attorney's fees" and another for $9,000 to Danny Fowler for "contract labor." Davis asked Samuel to send the checks to Davis's home, which he did via Lone Star Overnight Service.

Samuel's story was confirmed by records subpoenaed from Lone Star Overnight Service and a fingerprint analysis that showed fingerprints found on each of the checks matched those of Davis. Audwin Samuel and Danny Fowler, the individuals named on the checks, confirmed that Davis had asked them to cash the checks on his behalf.

Davis was then indicted for bribery, mail fraud, and other violations of federal law. Davis moved for dismissal of his indictment, arguing that the government had breached its proffer letter and plea agreement in indicting him and using his statements against him. However, the district court found that Davis had materially breached the plea agreement, which superseded the proffer letter, such that the government was not bound by the terms of the agreement.

We review a claim of breach of a plea agreement *de novo*, *U.S. v. Cantu*, 185 F.3d 298, 302 (5th Cir. 1999); *U.S. v. Castaneda*, 162 F.3d 832, 836 (5th Cir. 1998), accepting the district court's factual findings unless clearly erroneous. *United States v. Ballis*, 28 F.3d 1399, 1409 (5th Cir. 1994).

We must first determine which of Davis's agreements with the government, the initial proffer agreement or plea agreement, is the governing agreement. While we have not previously discussed whether plea agreements supersede proffer letters, we have held that plea agreements are contractual in nature and are to be construed accordingly. *Ballis*, 28 F.3d at 1409; *see also Hentz v. Hargett*, 71 F.3d 1169, 1173 (5th Cir. 1996). Thus, where Davis's plea agreement plainly provided that it superseded any other agreements reached between the parties and where Davis specifically represented to the trial court that he had entered into the plea agreement willingly, that he fully understood the terms of the agreement, and that there were no other promises made to him other than those contained in the plea agreement, it follows that Davis's plea agreement superseded the proffer letter. *See United States v. Fagge*, 101 F.3d 232, 234 (2nd Cir. 1996).

Next, we must determine whether the government breached that plea agreement. Where a defendant has fulfilled his obligations under the agreement, the government must perform its reciprocal promise. *Castaneda*, 162 F.3d 835-36. However, where the government can prove by a preponderance of the evidence that the defendant materially breached his commitment under the plea agreement, the government is released from its obligations under the agreement. *Id.; Ballis*, 28 F.3d at 1409 ("[I]f a defendant materially breaches his commitments under a plea agreement, the government is released from its obligations under that compact and may bring a new indictment on previously dismissed charges, regardless of what it may have promised earlier.")

A material breach is one that deprives the non-breaching party of the benefit of its bargain.

7

*Castaneda*, 162 F.3d at 837. As a corollary, "if a party's nonperformance . . . is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, the breaching party has substantially performed under the contract, and the non-breaching party is not entitled to rescission." *Id.* at 838 (citation and quotation marks omitted).

Davis's behavior amounted to a material breach of the plea agreement which released the government from its obligations under the agreement. First, Davis's failure to give officials information about the $21,000 and $9,000 checks was not innocent. Even when directly asked about those checks on several occasions, Davis denied knowing anything about them and even offered alternative theories about what the checks were for. Second, Davis's failure to disclose information about the checks directly contravened the purpose of the plea agreement, which was to investigate the role of Samuel and others in the bribery scheme. Certainly, information regarding a $30,000 bribe would be very valuable to the government in its investigation. Third, Davis's breach is not wholly dwarfed by the information he provided. The information that Davis did provide severely and inaccurately reduced his and Samuel's apparent involvement in illegal bribery transactions.

Finally, the government did not receive the benefit of its bargain. It is true that the Government did, in the end, obtain a guilty verdict against Samuel, largely due to Davis's information. However, the government spent hundreds, and perhaps thousands, of hours in its investigation which could have been avoided if Davis had admitted to knowing about the checks. The government did not receive the honest, truthful disclosure of information that it had bargained for. Thus, we affirm the district court's denial of Davis's motion to dismiss the indictment.[1]

---

[1] We note that in *United States v. Cantu*, 185 F.3d 298 (5th Cir. 1999), we recognized that the government's use of self-incriminating information provided by the appellant during debriefing raised Fifth Amendment concerns. *Id.* at 303. This case is distinguishable from *Cantu*.

### C. Limitation of Defense Counsel's Cross-Examination

Next, Davis argues that during his trial, the district court improperly limited defense counsel's cross-examination of Samuel in violation of the Sixth Amendment.

Samuel was cross-examined for two and one-half days, during which time defense counsel for both defendants vigorously impeached his credibility. As part of its cross-examination, defense counsel successfully elicited extensive information from Samuel regarding his plea agreement with the government. Defense counsel was able to ask Samuel whether he was under indictment, what the indictment was for, and whether dismissal of the indictment in exchange for Samuel's testimony at trial was part of a plea agreement. The only question the district court did not allow defense counsel to ask was whether Samuel felt he was guilty of the charges contained in the indictment that was the subject of his plea agreement.

We review a trial court's limitation of the scope of cross-examination for abuse of discretion. *United States v. Gordon*, 780 F.2d 1165, 1175 (5th Cir. 1986). *See also United States v. Brown*, 29 F.3d 953, 957 (5th Cir. 1994); *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993).

A defendant's right to cross-examine witnesses against him is a constitutional right secured by the Confrontation Clause of the Sixth Amendment. *United States v. Mayer*, 556 F.2d 245, 248 (5th Cir. 1977). Accordingly, a judge's discretionary authority to limit the scope of cross-

---

In *Cantu*, the government's proffer agreement specifically provided that "no statements made or other information or documents provided by you during the proffer will be used directly or derivatively against you in any criminal case." *Id.* at 302. Unlike Cantu, Davis freely and voluntarily agreed in his plea agreement that failure to provide complete and truthful information could render the agreement unenforceable and could result in his prosecution and the use of his statements against him in any proceeding. Thus, he knowingly and voluntarily agreed to the use of his statements and his prosecution in the event of his breach of the agreement. Accordingly, we have no Fifth Amendment concerns here.

9

examination comes into play only after the defendant has been permitted, as a matter of right, sufficient cross-examination to satisfy the Sixth Amendment. *Restivo*, 8 F.3d at 278. The Confrontation Clause is satisfied where defense counsel has been allowed to expose the jury to facts from which the jury "could appropriately draw inferences relating to the reliability of the witness." *Id.* at 278. (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). To demonstrate an abuse of discretion, the defendant must show that the court's limitation on cross-examination was clearly prejudicial. *Id.* at 278. That is, the defendant must show that a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning. *United States v. Maceo*, 947 F.2d 1191, 1200 (5th Cir. 1991).

It is clear that the jury's impression of Samuel's credibility would not have been altered had counsel been allowed to ask whether Samuel thought he was guilty of the charges that would be dismissed in exchange for his cooperation in prosecuting Davis. The jury was fully aware of the existence and nature of Samuel's plea agreement. Furthermore, significant impeachment evidence was presented during Samuel's direct and cross-examination, including the fact that Samuel was a convicted felon testifying in the hope of a sentence reduction. Additional impeachment evidence showed that Samuel had lied to his lawyer, to the City's Small Business Revolving Loan Committee, to friends, to the jury during his prior federal trials, and before a grand jury. Accordingly, we find no abuse of discretion in the trial court's limitation of Samuel's cross examination.

### D. Extrinsic Evidence

Finally, Davis argues that the jury in his case was impermissibly tainted by a reporter's comment made to a jury member as he exited the courthouse.

The incident on which Davis bases his final argument occurred in November, 2002, after

10

Davis's trial recessed for the evening. As the jurors left the courthouse, a news reporter approached Mr. Cain, one of the jurors in Davis's trial, and allegedly asked the juror whether there was going to be a "deal cut today." After Cain informed the trial judge about this incident, the judge informed Cain that there were no deals in the case, that each of the defendants had pleaded not guilty, and the government had the burden of proof in the case. Cain assured the judge that he was not affected one way or the other by the comment and that he would remain impartial throughout the trial. The reporter who allegedly made the improper remark claimed to only have said that an imminent favorable change in the weather was a "good deal."

Later, the trial court was notified that Cain had told some of the other jurors about the news reporter's comment. The judge then called each juror individually into the courtroom and asked each one whether he or she had heard Cain relate the reporter's comment and whether that would affect the juror's ability to remain impartial in the trial.

Four of the sixteen jurors recalled that Cain had told them that the reporter made a comment about the weather. Five did not hear Cain mention the comment at all. One juror had heard Cain talk about the reporter's remark, but he could not recall what Cain said the reporter's remark was. Only six jurors heard Cain say that a news reporter had asked if a deal would be cut that day. All of the jurors assured the court that they would be able to remain impartial jurors.

In reviewing the district court's refusal to grant a mistrial based on the introduction of extrinsic material to the jury, we review only for abuse of discretion, *United States v. Ruggiero*, 56 F.3d 647, 653 (5th Cir. 1995), and "accord great weight to the trial court's finding that the [extrinsic] evidence in no way interfered with any juror's decision." *Id.* (quoting *United States v. O'Keefe* 722 F.2d 1175, 1179 (5th Cir. 1983).

11

While juries are presumed impartial, the introduction of extrinsic evidence into the jury room requires a court to investigate the asserted impropriety. *Id.* at 652. *See also United States v. Herring*, 568 F.2d 1099, 1105 (5th Cir. 1978) (finding that district court committed error in failing to hold *voir dire* examination of jury members to determine extent of exposure and its effect on jurors' ability to render an impartial verdict where a front-page news article claiming key government witness had received death threats was published the day before the defendant was to testify). *But see United States v. Bernard*, 299 F.3d 467, 476-77 (5th Cir. 2002) (where an individual approached jury members and said, "Someone is going to die in that trial today," a hearing was not necessary because the passing statement of a crowd member was minimally prejudicial, even if it was intended to influence the jury).

If there is no reasonable possibility that the jury's verdict was influenced by the extrinsic evidence, the trial court may properly deny the defendant a new trial. *Ruggiero, 56 F.3d at 652*; *United States v. Ortiz*, 942 F.2d 903, 913 (5th Cir. 1991). Thus, there is a rebuttable presumption of prejudice to the defendant, and the government has the burden of proving the harmlessness of the extrinsic evidence. *Ruggiero*, 56 F.3d at 652. In assessing whether the extrinsic evidence improperly influenced the jury, a district court must examine the content of the material, the way in which it was brought to the jury's attention, and the weight of the evidence against the defendant. *Id.*

Here, the trial court investigated the asserted impropriety and determined that there was no reasonable possibility that the jury's verdict was influenced by the reporter's comment. We agree with the district court's determination. The weight of the evidence against Davis was substantial. The jury heard Davis admit he had taken bribes, and this was corroborated by Terry Samuel's testimony and additional evidence of specific bribe transactions. Furthermore, the reporter's

12

comment was so vague, that it would be difficult for jury members to infer anything from it. Not only was it unclear whether the reporter actually said anything about a "deal," it was unclear to whom and to what the reporter was referring if he did mention a "deal." It is not likely that, with the extensive evidence against Davis, the jury was influenced by the single, vague, and unsolicited comment of a reporter, especially where only six of the sixteen jurors knew about the comment and where all of those six jurors stated that they would disregard the comment in their deliberations. Thus, we find no abuse of discretion in the district court's denial of Davis's motion for mistrial.

## III. CONCLUSION

Davis's conviction is AFFIRMED.