IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 31, 2008

Charles R. Fulbruge III
Clerk

No. 05-10881

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL KEITH TISDALE; WILLIAM RANDOLPH TISDALE,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas
No. 3:03-CR-248-2

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

A jury convicted brothers Michael and William Tisdale of conspiring false-ly to represent a social security number, to commit identity theft, and to commit

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

bank fraud. The jury convicted William of access device fraud and Michael of two counts of bank fraud. Defendants contend their rights under the Speedy Trial Act were violated and that the district court erred in overruling their Batson challenge. They also aver that the court erred in determining their sentences by using the wrong version of the sentencing guidelines, by incorrectly calculating the amount of loss, by determining they were leaders or organizers of the conspiracy, and by failing to consider the 18 U.S.C. § 3553(a) factors. We affirm the convictions, but, because the court failed to consider § 3553(a) in sentencing, it committed procedural error and abused its discretion, so we vacate the sentences and remand for resentencing.

I.

A.

The defendants and at least five co-conspirators used the identities of recently deceased[1] persons to obtain money and property fraudulently. Defendants used newspaper obituaries and access to credit reports to identify people whose credit histories they could exploit. The credit reports were gained through access to various databases made available through Michael's insurance business, William's mortgage business, and an investment company operated by both.

After choosing only those recently deceased individuals with good credit histories, defendants arranged to create fake identifications, including Texas drivers' licenses and credit cards. William and Andera Kindred took photographs of their co-conspirators for the licenses; the photos were taken in Michael's office against a blue background similar to the one used for Texas drivers' licenses. Kindred took the photos and information provided by William to an unidentified person who fabricated the licenses.

---

[1] At least one person whose identity the Tisdales used was not deceased. Apparently he had been confused with a recently deceased man by the same name and approximate age.

Using the fake identification and the personal information of the deceased individuals, defendants, aided by at least five co-conspirators, defrauded financial institutions, retail businesses, and car dealerships, with focus on the financial institutions. One of the defendants would arrange for a loan using one of the stolen identities. On more than one occasion, William would then drive one of the co-conspirators to the institution, provide him with any required personal information about the deceased person, and give him the false identification for the deceased. The co-conspirator, posing as the decedent, would then enter the institution and sign for the loan proceeds. After receiving the loan check, the co-conspirator would depart and turn the check over to William; Michael would deposit the check in his account. Either William or Michael would pay the co-conspirator for his participation.

Defendants obtained loans for the purchase of various automobiles. Again, William or Michael would drive a co-conspirator to the car dealership and provide him with necessary personal information for the co-conspirator to memorize about the deceased individual, the fake driver's license, and proof of insurance issued by Michael's insurance agency. After receiving the vehicle, the co-conspirator would drive it to a pre-arranged location, turn the keys over to Michael, and return the fake identification. Michael would then pay the co-conspirator for his participation.[2] Using this scheme, defendants acquired three Porsches for themselves, a Jaguar for a co-conspirator and longtime friend, and a Corvette that ultimately went to a co-conspirator.

William traded or sold several identities to John Anderson, who represented himself as a car broker to Manufacturers Auto Leasing and used the identities to lease high-end vehicles that he subleased to others. William supplied the personal information, the false identification, and a co-conspirator to pose as the

---

[2] The co-conspirators were usually paid $1,200 for their participation in a vehicle transaction.

3

deceased individual at the closing. This scheme was used to lease six vehicles, for two of which William received half of the commission (approximately $4,000) paid to Anderson by the sub-lessor. Twice, Anderson gave the vehicles to William in lieu of any payment. In the end, the Tisdales used the identities of at least 36 persons to defraud at least 14 financial institutions; their activity included at least 13 vehicle transactions.

## B.

At sentencing, after ruling on the parties' sentencing guideline objections and hearing statements from witnesses, counsel, and the defendants, the court stated,

> The guidelines for William Tisdale are 97 to 121 months. And I will sentence the defendant to 97 months custody. That's 60 months on count 1[, the conspiracy charge,] and 97 months on count 2[, the access device fraud charge,] to be served consecutively–concurrently, I'm sorry.

> With regard to Michael Tisdale, his guidelines are 78 to 97 months. And I will sentence him to 97 months custody. That's zone–that's 60 months on count 1[, the conspiracy charge,] and 97 months on counts 3 and 4[, the bank fraud charges,] to be served concurrently.

> I will not impose any fines. The defendants do not have the ability to pay both fine and restitution.

> I will impose a restitution obligation of $240,488. That's jointly and severally with each other, also with Gary Allen Grace, Leron Lee, John Christopher Anderson.

## II.

The decision in Gall v. United States, 128 S. Ct. 586 (2007), confirms our two-step process for reviewing sentences imposed by district courts, see United

States v. Newsom, 508 F.3d 731, 733-34 (5th Cir. 2007).  First, we review for "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  Gall, 128 S. Ct. at 597; see Newsom, 508 F.3d at 733.  If there is no significant procedural error, we consider the "substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," employing a totality-of-the-circumstances test.  Gall, 128 S. Ct. at 597.

The defendants aver that the district court committed several procedural errors in arriving at their respective sentences and that the sentences are substantively unreasonable.  We consider each claim in turn.

## A.

Though we review the overall sentence for an abuse of discretion, id., we review the interpretation and application of the guidelines de novo.[3]  We review any factual findings for clear error.[4]

## 1.

Defendants claim the district court violated the Ex Post Facto Clause of the Constitution, Art. I, § 9, by calculating their sentences using a version of the guidelines manual that took effect after the date on which they committed the crimes of conviction.  "A sentencing court must apply the version of the sentencing guidelines effective at the time of the sentencing unless application of

---

[3] United States v. Villegas, 404 F.3d 355, 359 (5th Cir. 2005) (holding that United States v. Booker, 543 U.S. 220 (2005), did not alter the standard of review for the interpretation and application of the guidelines).

[4] Gall, 128 S. Ct. at 597; United States v. Smith, 440 F.3d 704, 706 (5th Cir. 2006).

that version would violate the Ex Post Facto Clause of the Constitution." United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999); see U.S.S.G. § 1B1.11(a), (b)(1) (2004); id. § 1B1.11(a), (b)(1) (2001).

The Ex Post Facto Clause "generally prohibits the retroactive application of the sentencing guidelines if it results in a more onerous penalty," Kimler, 167 F.3d at 893, in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed," U.S.S.G. § 1B1.11-(b)(1) (2004); id. § 1B1.11(b)(1) (2001). If the defendant is convicted of more than one offense, with at least one offense occurring before, and at least one after, a revised guideline manual became effective, the revised manual is applied to the offenses that occurred before and after the effective date. U.S.S.G. § 1B1.11(b)(3) (2004); id. § 1B1.11(b)(3) (2001).

The court calculated Michael's sentence using the November 1, 2001, guidelines. The offense date for the conspiracy charge was July 31, 2002; for both bank fraud charges, September 13, 2001. Under § 1B1.11(b)(3), the later offense date, July 2002, dictates which version of the guidelines ought to be used; accordingly, the court used the November 1, 2001, version. Though Michael contends that violated the Ex Post Facto Clause because those guidelines were not in effect on the offense date for the bank fraud charge, "where a sentencing court groups offenses committed before a change in the sentencing guidelines with offenses after the amendment, and then applies the amended guideline in determining a defendant's appropriate sentence, the Ex Post Facto Clause is not implicated." Kimler, 167 F.3d at 893.[5] Thus, the court did not violate the Ex Post Facto Clause in using the November 1, 2001, manual to calculate Michael's sentence.

_____

[5] Michael points us to Third and Ninth Circuit precedent. We need not consider these decisions, because one panel of this court cannot overrule another, Teague v. City of Flower Mound, 179 F.3d 377, 383 (5th Cir. 1999), and we are bound by Kilmer.

William's initial presentence investigation report ("PSR") states that the probation officer calculated his sentence under the November 5, 2003, edition of the guidelines; the second addendum to the PSR indicates that William's sentence was calculated under the November 5, 2004, edition. The court adopted the PSR subject to the second addendum, so the sentence was determined according to the November 2004 revision. As we have said, the court must use the guidelines in effect at the time of sentencing unless use of that version would violate the Ex Post Facto Clause. Kimler, 167 F.3d at 893; see U.S.S.G. § 1B1.11(a), (b)(1) (2004); id. § 1B1.11(a), (b)(1) (2001). William contends that use of the November 2004 version violates the Clause because it results in a higher sentencing range than under the November 1, 2000, manual.

Assuming the use of the November 2004 guidelines did violate the Ex Post Facto Clause, the district court would have to calculate William's sentence under the guidelines in effect on the offense date. U.S.S.G. § 1B1.11(b)(1) (2004); id. § 1B1.11(b)(1) (2001). As we have noted, when two offenses span a revision of the manual, the later date determines the version to use. U.S.S.G. § 1B1.11-(b)(3) (2004); id. § 1B1.11(b)(3) (2001).

The offense date for William's conspiracy charge is July 31, 2002; for his access device charge, September 17, 2001. The later date dictates the use of the November 2001 manual. Again, applying a later version of the guidelines when multiple offenses are grouped does not implicate the Ex Post Facto Clause. Kimler, 167 F.3d at 893.

Thus, William's sentence could be properly calculated only under the November 2004 version or the November 2001 version; the November 2000 manual was not an option. Because William has not demonstrated that the use of the November 2004 manual implicates the Ex Post Facto Clause vis-a-vis the November 2001 version, and we see no difference between the two versions that would affect his sentence, it was not error to use the November 2004 guidelines,

which were in effect on the date of sentencing.

## 2.

Defendants contend the district court committed procedural error by calculating the total intended loss without subtracting the value recovered by the defrauded institution where the institution was able to recover several vehicles and resell them. That is, defendants claim that the net loss, not the gross loss, should be considered. The PSR calculated the gross loss at $975,217; defendants assert that the gross loss, and the appropriate amount on which to base the sentence, is only $590,415.

The guidelines prescribe a fourteen-level increase to a base offense level of 6 if the loss is more than $400,000 and less than $1,000,001. U.S.S.G. § 2B1.1(b)(1)(H) (2004); id. § 1B1.1(b)(1)(H) (2001). Thus, whether the court calculated the sentence using the greater or the lesser amount, the result is a fourteen-level enhancement. Having applied the correct enhancement, the district court committed no procedural error.

## 3.

Defendants aver that the district court erred in finding them to be leaders or organizers of extensive criminal activity and applying a four-level enhancement for their leadership role under U.S.S.G. § 3B1.1(a). Again, we review factual findings supporting the application of the enhancement for clear error. Gall, 128 S. Ct. at 597.

The guidelines provide for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (2004); id. § 3B1.1(a) (2001). "To qualify for an adjustment under this section, the defendant must have been the organizer, [or] leader . . . of one or more other participants."

U.S.S.G. § 3B1.1 cmt. n.2 (2004); id. § 3B1.1 cmt. n.2 (2001).

In deciding whether an individual was a leader or organizer, the court ought to consider (1) the exercise of decisionmaking authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1 cmt. n.4 (2004); id. § 3B1.1 cmt. n.4 (2001). There can be more than one leader or organizer in a conspiracy. Id.

The PSR concluded that both men were leaders. That decision rested on evidence that others identified the brothers as leaders, that the scheme originated with them, and that they were responsible for obtaining the names and social security numbers of the deceased persons whose identities were used. The PSR noted that the brothers controlled the fraudulent identification information and drivers' licenses, recruited others to participate and pose as the deceased individual, and paid those who participated in the scheme.

Both defendants objected to those findings. They did not, however, present rebuttal evidence, but merely asserted and continue to claim that there is no evidence to support the PSR's findings and ultimate conclusion. Findings of fact included in a "PSR are considered reliable and may be adopted without further inquiry if the defendant fails to present competent rebuttal evidence. Such rebuttal evidence must demonstrate that the PSR information is 'materially untrue, inaccurate or unreliable.' Mere objections do not suffice as competent rebuttal evidence." United States v. Parker, 133 F.3d 322, 329 (5th Cir. 1998) (internal citations omitted). In the absence of rebuttal evidence, the district court was entitled to adopt the findings of the PSR to support its conclusion that the defendants were leaders of the conspiracy.

Defendants object that the PSR did not distinguish between the two of

them, suggesting that one or the other might have erroneously received the label of leader based on the actions of the other. The court, however, was not limited to the PSR in looking for evidence indicating the defendants were leaders or organizers; it could consider evidence presented at trial as well.

Co-conspirators testified that William had recruited them to participate in the fraud and that he controlled the fake drivers' licenses and identity information, doling them out to other participants only when necessary to conduct transactions and then collecting them on completion of the transaction. There was testimony that William became upset when a co-conspirator used one of the identities to purchase motorcycles without his permission and that William paid the co-conspirators for their participation as though they were employees, determining the type and amount of compensation.

This type of decisionmaking authority is specifically mentioned in the guidelines as the claimed right to a greater share of the fruits of the crime. See U.S.S.G. § 3B1.1 cmt. n.4 (2004); id. § 3B1.1 cmt. n.4 (2001). The control William exhibited over the false identification and personal information used in the conspiracy, as well as the actions of co-conspirators who posed as those individuals, was indicative of a leader or organizer and supports the conclusion that he was a leader and organizer.

There is evidence that supports the conclusion that Michael directed much of the research into the credit histories of the deceased, because his office and his access to credit reports were used to gather the personal information essential to the scheme. Indeed, some of the reports could be obtained only with his company password. Additionally, every fraudulently-obtained check was deposited in Michael's bank account, giving him control over the great majority of the criminal proceeds. Michael, like William, also paid co-conspirators, as if they were employees, for following his direction and posing as one of the deceased individuals. Also like William, Michael maintained control of the fake drivers' licenses

10

and credit cards until it was time for a co-conspirator to conduct a transaction.

In the end, it was not clearly erroneous to conclude that the defendants exercised significant decisionmaking authority, recruited accomplices, claimed a right to a larger share of the fruits of the crime, and exercised substantial control over every other co-conspirator. Additionally, it was not clear error to conclude that more than five individuals were involved in the criminal activity and that each brother was a leader of at least one of the co-conspirators. Thus, there was ample evidence to support the district court's decision, and it did not err in applying the appropriate four-level enhancement.

4.

Defendants contend the district court committed procedural error by failing to consider § 3553(a). All sentencing proceedings should begin with a correct calculation of the applicable guidelines range, which serves as the initial benchmark. Gall, 128 S. Ct. at 597; see Rita v. United States, 127 S. Ct. 2456, 2465 (2007). "The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall, 128 S. Ct. at 596 (footnote omitted). Such consideration of the § 3553(a) factors is not discretionary but is essential to determining a reasonable sentence.

It is only after considering the § 3553(a) factors that the district court can determine whether a within-guidelines sentence is appropriate or whether, instead, the court ought to deviate, either above or below, from the starting point established by the guidelines. It is not enough for the court merely to adopt a within-guidelines sentence; it "may not presume that the Guidelines range is reasonable." Gall, 128 S. Ct. at 596-97.

The guidelines express the Sentencing Commission's "view of the appropri-

11

ate application of § 3553(a) in the mine run of cases," Rita, 127 S. Ct. at 2465; to determine whether the case before it is such a mine run case, a district court must apply the § 3553(a) factors and "make an individualized assessment based on the facts presented," Gall, 128 S. Ct. at 597. Failure to apply the § 3553(a) factors is procedural error. Id. at 598.

Consideration of the § 3553(a) factors does not always require a written opinion or lengthy statement on the record:

> [W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation. Circumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3353(a) and other congressional mandates) in the typical case, and that the judge has found that the case before him is typical.

Rita, 127 S. Ct. at 2468. In fact, "unless a party contests the Guidelines sentence generally under § 3553(a)SSthat is argues that the Guidelines reflect an unsound judgment, or, for example, that they do not generally treat certain defendant characteristics in the proper waySSor argues for departure," the judge normally need say no more." Id.

If, however, as in this case, the defendant or the government offers a reasonable argument against applying the within-guidelines sentence, the court ordinarily should give some explanation why it has rejected that contention. Id. At a minimum, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Id.[6]

---

[6] In Rita, the sentencing court, after hearing the arguments of counsel, stated only that it was "'unable to find that the [presentence report's recommended] sentencing guideline range . . . is an inappropriate guideline range for that, and under [§] 3553 . . . the public needs to be protected if it is true, and I must accept as true the jury verdict.'" Rita, 127 S. Ct. at 2462 (ellipses in Supreme Court opinion). The court concluded by saying that it "'finds that it is ap-
(continued...)

At the sentencing hearing, the court heard argument from the government and the defendants' respective attorneys. All the parties offered § 3553(a) arguments. Defense counsel urged that the guidelines recommended a sentence range that was greater than necessary to protect the public from further crimes by the defendants and to deter criminal conduct by others. See § 3553(a)(2). They also argued that the guideline range created a disparity between the defendants and their co-conspirators. See § 3553(a)(6). The court gave no indication it had considered these § 3553(a) arguments or any of the § 3553(a) factors. Instead, it merely restated the guidelines' range and imposed a within-guidelines sentence for both defendants.

Under Rita, 127 S. Ct. at 2468, failure to offer any reason whatsoever for rejecting the defendants' § 3553(a) arguments or any explanation for following the guidelines range constitutes failure to consider the § 3553(a) factors. Under Gall, that failure is procedural error and an abuse of discretion, so we vacate the sentences and remand for re-sentencing.

## B.

Defendants contend their within-guidelines sentences are substantively unreasonable. We do not reach the question of substantive reasonableness if, as here, we find procedural error. Gall, 128 S. Ct. 597.

## III.

Defendants aver that the commencement of their trial more than eight months after their arraignment violates their rights under the Speedy Trial Act. They raise this issue for the first time on appeal. The Speedy Trial Act states

---

[6] (...continued)
propriate to enter'" a sentence at the bottom of the guideline range. Id. The Supreme Court declared that response to be "brief but legally sufficient." Id. at 2469.

that "[f]ailure of the defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal under this section."  18 U.S.C. § 3162(a)(2).

To counter this straightforward statutory text, the defendants point to Zedner v. United States, 126 S. Ct. 1976 (2006).  Zedner, however, confirms that defendants have waived their rights under the Speedy Trial Act.  The Court held that § 3162(a)(2) does not allow a prospective waiver but does require a defendant to assert the right before trial, in part, to "ensur[e] that an expensive and time-consuming trial w[ould] not be mooted by a late-filed motion."  Zedner, 126 S. Ct. at 1986-87.  Allowing these defendants to raise this issue for the first time on appeal would not only ignore the plain language of the statute, but would allow defendants to moot an expensive and time-consuming trial.  In light of the statute's plain language and its purpose, as recognized by the Court, defendants waived any right to dismissal under the Speedy Trial Act by their failure to move for dismissal before trial.

IV.

Defendants assert that the district court erred by accepting the government's explanation, in response to their Batson challenge, see Batson v. Kentucky, 476 U.S. 79 (1986), for using a peremptory challenge against a black venire member.  We review for clear error a decision that a peremptory strike was not race-based.  United States v. Davis, 393 F.3d 540, 544 (5th Cir. 2004).  "In reviewing the district court's determination, we must give great deference to the district court because 'findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge.'" Id.  (quoting United States v. Bentley-Smith, 2 F.3d 1368, 1373 (5th Cir. 1993)).

The Due Process Clause of the Fifth Amendment prohibits race-based use

of peremptory strikes. Batson, 476 U.S. at 84. The party challenging the strike bears the burden of persuasion to show that the strike was purposefully discriminatory; it must first make a prima facie showing that the strike was racially motivated. Davis, 393 F.3d at 544. If the prima facie standard is satisfied, the party accused of making the discriminatory strike bears the burden to articulate a race-neutral justification for the strike. Id. Finally, the trial court must determine whether the party making the challenge has carried its burden of proving purposeful discrimination. Id.

The defendants challenged the government's peremptory strike of a black male. The government volunteered its rationale, which was that the individual had been sleeping during voir dire, and the government feared he might sleep again during trial. Defendants did not challenge the government's claim that the venire member had fallen asleep during voir dire, and the court accepted the justification as race-neutral and overruled the Batson challenge.

Given the deference we owe to the district court, and in the absence of any evidence or argument offered to that court that the juror was not asleep or that the government's explanation was pretextual, it was not clear error to conclude that the defendants had failed to meet their burden of persuasion.

The convictions are AFFIRMED. The sentences are VACATED and REMANDED for resentencing.