

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| KRISTINE SMOTHERMAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | WD78111 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | November 10, 2015 |
| CASS REGIONAL MEDICAL CENTER, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Cass County, Missouri**
**The Honorable William B. Collins, Judge**

**Before Division Three:** Joseph M. Ellis, Presiding Judge, and
Karen King Mitchell and Gary D. Witt, Judges

Kristine Smotherman appeals a verdict in favor of Defendant, Cass Regional Medical Center. Smotherman alleged that she slipped and fell while on the Medical Center's property and was injured due to the Medical Center's negligence.[1] Smotherman argues that the trial court should have granted a new trial due to juror misconduct. We reverse and remand.

---

[1] The Petition also alleged claims on behalf of Smotherman's husband, Brian, who has not filed a notice of appeal or participated in the briefing.

**Facts**

Smotherman was at the Medical Center for a follow-up visit with her doctor six weeks after having knee surgery. Following her appointment, Smotherman approached a nurses' station and asked where the closest restroom was. One of the nurses escorted Smotherman to the nearest restroom, which they discovered was dark because the Medical Center was operating at the time on emergency generators that did not supply power to every room. The nurse then led Smotherman to another, smaller, restroom that was lit.

Smotherman testified that, as she was about to stand up after using the toilet, the lights went out. She then testified that, as she was getting up, her "feet just went completely out from underneath" her. She testified that it was "just – like [she] was on rollerskates." Smotherman slipped and fell, hitting her head, back, and arm. A nurse found Smotherman on the floor and took her to the emergency room. Smotherman testified that, while in the emergency room, she heard a nurse or doctor state that "she slipped and fell in the hall bathroom on soap." On cross-examination, Smotherman admitted that she did not look to see what she had slipped on, and did not recall seeing anything on the restroom floor or any stains, other than blood, on her clothing. Smotherman received injuries from the accident and experienced severe complications due to an infection caused by a type of bacteria that entered Smotherman's arm through a cut she received in the fall.

Smotherman's theory at trial was that the soap dispenser next to the sink in the small restroom had been leaking soap, as evidenced by a strip of rust on the heating element directly below the dispenser and the sink. Smotherman argued that, because a person entering the restroom had to pass very close to the sink due to the location of the door, soap on the floor

could have made its way onto Smotherman's shoes as she entered the restroom or found its way to the floor by the toilet, causing the floor to be slick.

In its closing argument, the Medical Center focused on Smotherman's credibility, noting her evolving story and multiple criminal convictions, as well as the lack of direct evidence of soap on the floor. The Medical Center argued that the rust on the heating element was more likely from people dripping water when they reached for the soap dispenser with wet hands, and discussed:

> the improbability that a person with sneakers that she had on, Nike tennis shoes, I believe, with rubber soles, both of them were such that both her feet slipped out from under her as she tried to stand up. Her feet slid out, she hit her back, she came up and hit her head, then she hit a register and then she ended up in a sitting position. That doesn't make much sense either.

The Medial Center argued that it was more likely that Smotherman simply fell, due to problems with her knee: "We know she has had falls, we know she had a bad knee that she just had surgery on, we know she's had that problem since she was 12 she said. We know she has had several falls before this, a couple that caused her to fall and hit her eye."

The Medical Center also noted that, during a visit with a doctor roughly a week after the fall, Smotherman told the treating physician that "she stumbled and maybe slipped on some water or something on the floor and fell." The following day, however, while visiting a second physician, Smotherman reported "that she slipped on some soap on the floor." The Medical Center argued to the jury:

> Before this lawsuit happened, [Smotherman] went to see a doctor, and the doctor states, this is Dr. Hafer, Exhibit 108, you see that the patient states she stumbled, maybe slipped on something, some water or something on the floor and fell. The next day, the exhibits they talked about, Dr. Queenan states, [w]ell, the patient states she slipped on some soap on the floor. What is her evidence of soap on the floor?

3

At the close of evidence, the court instructed the jury that, to find the Medical Center liable, it must find that "there was soap on the bathroom floor, and as a result [the Medical Center's] bathroom was not reasonably safe." The court also gave the jury MAI 2.01(8), which prohibits juror communication or research. The jury returned with a verdict assessing zero percent fault against the Medical Center, with eleven jurors joining the verdict.

Following trial, two jurors agreed to speak with Smotherman's counsel about the trial. When asked what led to their verdict, the first juror indicated that she "didn't feel like you could prove more likely than not that there was soap on the floor in the bathroom." The second juror noted that the rust on the heating element "could have happened at any time, that hospital had been there since 1963." The second juror then offered that he had "checked the weather forecast for th[e] day [of the accident] and the forecast was for eight to ten inches of snow."

Smotherman moved for a new trial, alleging juror misconduct, based on the juror's gathering of extraneous information. Nine jurors, eight of whom signed the verdict, testified at the post-trial hearing on Smotherman's motion. Five of the jurors, including the juror who had not signed the verdict, testified that they did not remember hearing anyone mention the weather during deliberations. The others testified that they recalled a juror mention that the forecast had been for snow on the date in question, and that the comment was made once with no further discussion. The Medical Center offered affidavits of the remaining three jurors, who all testified that they did not hear the comment. All of the jurors testified that the weather, and extraneous evidence based on the weather, did not have any effect on their determination.

Following the hearing, the trial court determined that a juror had engaged in misconduct by looking up the weather forecast for the day of the accident and relaying the information to the jury. The court afforded no weight to the offending juror's testimony that the extraneous

4

evidence was not a factor in his decision. The trial court found credible the other jurors' testimony that they had either not heard, or paid no attention to, the extraneous evidence. The court overruled the motion for new trial, holding that "[e]ven if the court were to disregard the offending juror's vote, the verdict would still be supported by ten qualified jurors, who diligently executed their civil duty." Smotherman timely appealed.

## Standard of Review

"A motion for new trial, based on a juror's acquisition of extraneous evidence, is left to the sound discretion of the trial court." *Travis v. Stone*, 66 S.W.3d 1, 3 (Mo. banc 2002). "The appellate court may reverse the lower court's denial of a new trial if it appears that the trial court abused its discretion in ruling on the issue of extraneous evidence or the issue of prejudice." *Id.* "However, once it is established that a juror has gathered evidence extraneous to the trial, prejudice will ordinarily be presumed, and the burden is on the respondent in such a case to overcome the presumption of prejudice." *Id.* "'Where the trial court has refused to grant a new trial on account of alleged misconduct, the revi[ew by] the appellate court will be exercised more freely than where a new trial has been granted.'" *McBride v. Farley*, 154 S.W.3d 404, 411 (Mo. App. S.D. 2004) (quoting *Fitzpatrick v. St. Louis-San Francisco Ry. Co.*, 327 S.W.2d 801, 808 (Mo. 1959)).

## Analysis

Generally, "Missouri recognizes the Mansfield Rule;[2] *i.e.,* jurors may not impeach their verdict, violate secrets of the jury room, tell of partiality or misconduct that occurred there, or speak to motives that induced or operated to produce the verdict." *Matlock v. St. John's Clinic,*

---

[2] In the English case *Vaise v. Delaval*, 99 Eng. Rep. 944 (K.B. 1785), "Lord Mansfield established the rule that a juror could not 'allege his own turpitude.'" Timothy C. Rank, *Federal Rule of Evidence 606(b) and the Post-Trial Reformation of Civil Jury Verdicts*, 76 Minn. L. Rev. 1421, 1425-26 (1992). "Thus, a juror could not offer testimony to impeach a verdict once it was rendered. Lord Mansfield's rule soon became universally followed in both England and the United States." *Id*. at 1426.

5

*Inc.*, 368 S.W.3d 269, 271 (Mo. App. S.D. 2012). But the "Missouri Supreme Court has recognized two exceptions—jurors can testify about: 1. Ethnic or religious bias or prejudice expressed during deliberations[; or] 2. That a juror independently gathered evidence outside the courtroom." *Id*. The second exception applies here.

"[O]nce it is established that a juror has gathered evidence extraneous to the trial, prejudice will ordinarily be presumed, and the burden is on the respondent in such a case to overcome the presumption of prejudice." *Travis*, 66 S.W.3d at 3. "In determining whether prejudice resulted from alleged juror misconduct due to a juror's obtaining extraneous evidence, an important factor is the materiality of the evidence." *State v. Stephens*, 88 S.W.3d 876, 883 (Mo. App. W.D. 2002). "Immaterial evidence is not prejudicial." *Id.* "To be 'material,' evidence must '[h]av[e] some logical connection with the consequential facts.'" *Id*. at 883-84 (quoting BLACK'S LAW DICTIONARY 991 (7th ed. 1999)).

The Medical Center argues that several factors show that either the extrinsic evidence was immaterial, or the presumption of prejudice is rebutted. The Medical Center argues that: (1) the potential for snowfall outside of the building had no relevance to what it claims was the central issue to the case—i.e., whether there was soap on the floor of the interior bathroom; (2) all of the jurors that testified[3] indicated that either they did not hear the extraneous evidence or it was mentioned once, but it had no effect on their verdict; and (3) there was little evidence

---

[3] Three jurors were unavailable to testify, so the Medical Center submitted affidavits from them. The trial court "did not receive or consider the affidavits" because the witnesses were "unavailable for cross-examination." The Medical Center urges us to consider the affidavits despite the trial court's exclusion. While affidavits may be admitted in support of or against motions, the decision "whether to admit or rely upon affidavits in deciding a motion is within the discretion of the trial court." *Green v. Fred Weber, Inc.*, 254 S.W.3d 874, 883 n.10 (Mo. banc 2008); *State v. Wolfe*, 13 S.W.3d 248, 262 (Mo. banc 2000) ("In sum, the affidavit was never subject to cross-examination. There was no opportunity to examine the statement for credibility. The court did not abuse its discretion in excluding the affidavit.") (internal citation omitted), *overruled on other grounds by Mitchell v. Kardesch*, 313 S.W.3d 667 (Mo. banc 2010). In any event, for the reasons explained in the opinion, considering the affidavits would not alter our analysis.

6

that there was soap on the floor of the bathroom; thus, the relative weakness of Smotherman's case makes it unlikely that she was prejudiced.

Here, we cannot say that the extraneous evidence was immaterial. The issue at trial was whether Smotherman slipped in the bathroom, and, if so, whether she slipped on soap. The extraneous evidence offers another plausible explanation that, if believed, could have relieved the Medical Center of liability as the case was instructed: that the floors were wet with water from people tracking in snow due to significant snowfall, which caused Smotherman to slip and fall.

Contrary to the Medical Center's argument, this case is unlike *State v. Stephens*, in which the extraneous evidence was simply not at issue in the trial. In *Stephens*, a case involving a prosecution for rape, kidnapping, and assault by strangulation, one of the jurors "conducted . . . an independent investigation of the park where the victim had regained consciousness after having been transported there by the" defendant. 88 S.W.3d at 884. The defendant argued that "the remoteness of the park was critical to whether the jury believed that he had stopped at the park while trying to find a hospital for the victim and was lost . . . , or whether he had driven to the park for the purpose of 'dumping' the victim, demonstrating a consciousness of guilt." *Id*. This court disagreed, determining that "[a] detailed review of the record indicates that the remoteness of the park was never at issue at trial such that the jury's determination of the appellant's guilt . . . would not have been improperly influenced by the alleged extraneous evidence as to that issue." *Id*. "[W]hile the characterization of the park's location being remote, extremely remote, etc., might have been subject to some dispute, the basis of such characterizations, the actual location of the park, either in absolute terms or in terms comparing it to other known landmarks, was not." *Id*. Rather, all of the evidence, including defendant's

7

testimony, was that the park was remote. *Id*. at 884-85. The court referred to the case as "a classic case of a defendant being stuck with a fact at trial, in that there is no viable way to refute it, and simply trying to put a different spin on that fact, in light of the other facts in the case, other than the spin offered by the State." *Id*. at 885. Thus, it was clear that the evidence was immaterial to the case and therefore not prejudicial.

Again, here the issue was whether Smotherman slipped, and if so, what substance she slipped on. Other than the physician's report indicating that "she stumbled and maybe slipped on some water or something on the floor and fell," there was no evidence that there was water on the floor, or that there was an obvious source of water on the floor. Far from "being stuck with a fact at trial," both the existence and nature of the substance on the floor were hotly contested. The juror who improperly researched the extraneous evidence thought it important enough to mention as a reason for deciding the way he did, and the Medical Center's closing argument strongly suggested that, if Smotherman had slipped, it was water that caused the slip: "she went to see a doctor, and the doctor states . . . that the patient states she stumbled, maybe slipped on something, some water or something on the floor and fell." The existence, nature, and source of material on the floor was a central issue of the case. And the extraneous evidence gave the jury a reason to improperly determine that water from heavy snowfall was the cause of Smotherman's slip and fall. The evidence is material, and went to a central issue in the case.

The Medical Center next argues, relying on federal precedent, that the manner in which the extrinsic evidence was brought to the jury's attention is a factor to consider, and that the jurors who heard the comment testified that it was mentioned only once, in passing. *See United States v. Davis*, 393 F.3d 540, 549 (5th Cir. 2004) (In a criminal trial, when "assessing whether the extrinsic evidence improperly influenced the jury, a district court must examine the content

8

of the material, the way in which it was brought to the jury's attention, and the weight of the evidence against the defendant."). But *Davis* does not appear to state the law as it has been announced by the Missouri Supreme Court. In *Travis*, 66 S.W.3d at 5, the Court overturned the trial court's denial of a new trial for juror misconduct, even though there was no evidence that the offending juror had shared the information with any other jurors. There, the juror had visited the scene of an accident, which "provided her with information that helped her to understand the testimony presented at trial." *Travis*, 66 S.W.3d at 3. The trial court denied the motion for new trial, and the Court reversed on appeal, holding:

> it must be assumed that [the juror's] visit had an impact on her decision making, which in turn influenced her participation in the jury deliberations. This could have subtly affected the outcome of the case, and it would be virtually impossible for anyone to demonstrate the effect of her interactions on the deliberations, especially given the fact that there is no contemporaneous record of jury deliberations.

*Travis*, 66 S.W.3d at 5. If the existence of extraneous evidence can prejudice the jury deliberations even when it was not presented to the remaining jurors, then we are unable to hold that the nature in which the extrinsic evidence here was communicated—even if it was an isolated comment made only in passing—necessarily renders it not prejudicial.

The Medical Center next points out that all of the jurors testified that the extrinsic evidence did not affect their verdict. While conceding that the offending juror's testimony should receive no weight, the Medical Center argues that the testimony of the remaining jurors was found credible by the trial court and is sufficient to overcome the presumption of prejudice. We disagree.

While *Travis* involved the testimony of only the juror who had committed the misconduct, the Court held that "[u]ltimately, the case is governed by *Middleton* [*v. Kansas City Pub. Serv. Co.*, 152 S.W.2d 154, 160 (Mo. 1941)]." 66 S.W.3d at 6. In *Middleton*, "[t]here were

9

even affidavits submitted by nine other jurors to the effect that any [extrinsic evidence obtained by a juror] had no effect on the verdict." *Id*. The "Court nevertheless held that the trial court abused its discretion in denying the motion for new trial, because the presumption of prejudice was quite strong, and the statements of the jurors minimizing the effect of the misconduct were entitled to very little weight." *Id*.; *Middleton*, 152 S.W.2d at 160 ("We think these affidavits had little probative value because of the common tendency of jurors to minimize the effect of misconduct."); *State v. Cook*, 676 S.W.2d 915, 917 (Mo. App. E.D. 1984) ("a juror may sincerely claim to have been unaffected but have no awareness of the unconscious influence of the information"). Given the high standard to overcome the presumption of prejudice caused by juror misconduct, and the modest weight given to jurors' claims that they were not affected by extrinsic evidence, we must conclude that the jurors' testimony does not overcome the presumption.

Finally, the Medical Center argues that the weight of the evidence at trial supports the verdict, noting that at trial it pointed out serious issues with Smotherman's credibility, and the lack of direct evidence of soap on the floor. The trial court agreed, referring to Smotherman's evidence as "underwhelming." But the trial court also denied the Medical Center's motion for directed verdict, meaning that it believed that the evidence supported a finding that there was soap on the floor. *See Randel v. City of Kansas City*, 467 S.W.3d 383, 386 (Mo. App. W.D. 2015) ("If at least one element of the plaintiff's case is not supported by the evidence, then a directed verdict is appropriate . . . ."). Even if Smotherman's case is not particularly strong, there was, according to the trial court, sufficient evidence to support a verdict in Smotherman's favor. Moreover, "the more important factor in determining prejudice is the materiality of the

10

evidence." *Travis*, 66 S.W.3d at 6.  And here, "the evidence gathered pertained to a critical issue in the case." *Id.*

We empathize with the Medical Center, which, acting in good faith and having committed no wrongdoing, received a defense verdict.  And certainly, "jury verdicts 'should not be set aside lightly or capriciously.'" *Missouri Pub. Serv. Co. v. Allied Mfrs., Inc.*, 579 S.W.2d 787, 789 (Mo. App. W.D. 1979) (quoting *Moore v. Glasgow*, 366 S.W.2d 475, 481 (Mo. App. 1963)).  But it is also axiomatic that "'[e]ven though three-fourths of them can decide a civil case, parties are entitled to have that decision, whether for them or against them, based on the honest deliberations of twelve qualified [individuals].'" *Stotts v. Meyer*, 822 S.W.2d 887, 891 (Mo. App. E.D. 1991) (quoting *Thorn v. Cross*, 201 S.W.2d 492, 497 (Mo. App. 1947)).  And mandatory authority requires that, where there is juror misconduct from gathering evidence related to a material issue, the opposing party must show something more than the jurors' bare assertions that their deliberations were not affected or the relative weakness of a plaintiff's case, in order to overcome the presumption of prejudice.[4]  *See State v. Herndon*, 224 S.W.3d 97, 103 (Mo. App. W.D. 2007) (The presumption that a criminal defendant was prejudiced by a third party communicating to the jury was overcome because the third party was arguing for *acquittal*. Had the inappropriate information "influenced the jury, we can safely assume that the jury would have entered a verdict of not guilty.").  We find nothing in the record establishing that Smotherman was not prejudiced by juror misconduct.  Accordingly we must reverse.

---

[4] We do wish to express our concern with what appears to be a troubling increase in the frequency of juror misconduct challenges.  These challenges are often brought by unsuccessful litigants who, not satisfied with the verdict they received, proceed to question jurors in the days following trial in an effort to invade the sanctity of the jury room in order to unearth the slightest hint of impropriety.  We note, however, that Smotherman's counsel engaged in no such conduct here.  Rather, they simply engaged in the common and accepted practice of interacting with some jurors, who voluntarily agreed to discuss their thoughts, outside the courtroom immediately following trial.  The jurors volunteered all of the information provided.

## Conclusion

Because the Medical Center has not overcome the presumption that Smotherman's right to a fair trial was prejudiced by juror misconduct, we reverse and remand for the trial court to hold a new trial.

_____
Karen King Mitchell, Judge

Joseph M. Ellis, Presiding Judge,
and Gary D. Witt, Judge, concur.