**UNITED STATES of America**

v.

**Marc GUYTON, et al.**

**Criminal Action No. 11–271.**

United States District Court,
E.D. Louisiana.

Signed July 31, 2014.

---

15. *See id.*

18. *Id.*

Sharan E. Lieberman, Andre Jude Lagarde, J. Collin Sims, John F. Murphy, Kevin G. Boitmann, Mark A. Miller, Michael M. Simpson, U.S. Attorney's Office, New Orleans, LA, for United States of America.

Herbert Victor Larson, Jr., Herbert V. Larson, Jr., Attorney at Law, John Wilson Reed, Glass & Reed, Sara A. Johnson, Sara A. Johnson, Attorney at Law, Rachel I. Conner, Rachel I. Conner, Attorney at Law, Stephen H. Shapiro, Stephen H. Shapiro, Attorney at Law, George Chaney, Jr., Jordan Mark Siverd, Federal Public Defender, Steven Lemoine, Steven Lemoine, Attorney at Law, Frank G. Desalvo, Brigid E. Collins, Frank G. Desalvo, APLC, New Orleans, LA, Bruce C. Ashley, II, Bruce C. Ashley, II, Attorney at Law, Michael Gerard Riehlmann, Michael G. Riehlmann, Attorney at Law, Gregory J. Lewis, Jr., Lewis Law Firm, New Orleans, LA, John Herr Musser, IV, Toledano & Herrin, APLC, Robin Elise Schulberg, Robin Elise Schulberg, Attorney at Law, Covington, LA, Michael William Boleware, Law Offices of Michael W. Boleware, Denham Springs, LA, Michael F. Walther, Walther Law, PC, Johnstown, PA, Raymond Porter, Fcc–Low Yazoo City, Yazoo City, MS, Christopher Albert Aberle, Christopher A. Aberle, Attorney at Law, Mandeville, LA, Michael Paul Ciaccio, Michael Paul Ciaccio, Attorney at Law, Gretna, LA, Mark David Plaisance, Mark D. Plaisance, Attorney at Law, Thibodaux, LA, for Marc Guyton, et al.

## ORDER AND REASONS

JANE TRICHE MILAZZO, District Judge.

Before the Court is a Motion to Vacate the Plea Agreements of Marc Guyton and Dorian Goins (R. Doc. 770), and a Motion to Vacate the Plea Agreements of Harry Berry and Terrance Henderson (R. Doc. 767). For the following reasons, the former is DENIED and the latter GRANTED IN PART. Harry Berry's plea agreement is hereby VACATED. The plea agreements of Marc Guyton, Dorian Goins, and Terrance Henderson shall remain intact.

## BACKGROUND

This case has been pending for approximately 44 months and contains more than 1,000 docket entries. The Court has entertained numerous motions, held multiple evidentiary hearings, and met with counsel on several occasions. The facts are so voluminous, the procedural history so complex, and the legal issues so nuanced that not even the most crafty of law professors could put this to his students. Suffice to say, *United States v. Guyton, et al.* is no ordinary criminal matter.

Pending before the Court are motions to vacate the plea agreements of four Defendants: Marc Guyton ("Guyton"), Dorian Goins ("Goins"), Harry Berry ("Berry"), and Terrance Henderson ("Henderson") (at times collectively referred to as the "Pleading Defendants"). The Government alleges the Pleading Defendants breached their individual plea agreements. The Pleading Defendants oppose the motions. The Court discusses the background facts relevant to all Pleading Defendants before addressing the facts germane to each.

### I. *Background Facts*

On October 21, 2011, a federal grand jury sitting in the Eastern District of Louisiana indicted the Pleading Defendants and ten other individuals for conspiracy to possess with the intent to distribute one

kilogram or more of heroin.[1] Over the next few years, several defendants pleaded guilty. Trial for the remaining defendants was set for May 13, 2013.

As Trial approached, only eight defendants remained: Guyton, Henderson, Berry, Goins, Ernest Jones ("Jones"), Raymond Porter ("Porter"), Clarence Haines ("Haines"), and Jose Iturres–Bonilla ("Iturres–Bonilla"). On April 24, 2013, the Government offered a "global" plea agreement to the remaining defendants, which required them to stipulate to the same factual basis. This agreement did not require the defendants to cooperate with the Government. The Government withdrew the offer a mere three days later, apparently because the United States Attorney for the Eastern District of Louisiana would not authorize any plea agreement that did not require cooperation.

Plea negotiations continued. Guyton and Goins pleaded guilty on May 4, 2013 pursuant to Rule 11(c)(1)(C) agreements.[2] The plea agreements required cooperation with the Government.[3] The Court accepted the guilty pleas but deferred acceptance of the plea agreement pending review of the pre-sentence report.

Berry, Henderson, and Jones pleaded guilty on May 10, 2013 pursuant to Rule 11(c)(1)(C) agreements. The agreements contained a cooperation addendum identical to the addendum attached to the plea agreements for Guyton and Goins. Again, the Court deferred its decision to accept the plea agreement.

On May 13, 2013, the Government proceeded to trial (the "Trial") against Porter, Haines, and Iturres–Bonilla (collectively the "Trial Defendants"). Assistant United States Attorneys Sharan Lieberman ("Lieberman"), John Murphy ("Murphy"), Collin Sims ("Sims"), and Bill McSherry ("McSherry") (collectively the "Trial AUSA's") represented the Government. Although the Government's witness list included the Pleading Defendants, the Government did not call any of them to testify. Trial concluded on May 23, 2013. A jury found the Trial Defendants guilty on all counts.[4]

On July 29, 2013, the Government moved to revoke the plea agreements of the Pleading Defendants, arguing that they breached their agreements by failing to cooperate with the Government. The memoranda in support consisted largely of unsubstantiated allegations. Accordingly, the Court ordered an evidentiary hearing, which took place over the course of five days.[5] The parties have submitted post-

---

1. The indictment was superseded on October 26, 2012, and again on January 25, 2013.

2. Guyton and Goins stipulated to the same factual basis.

3. Prior to the re-arraignment colloquy, Guyton moved this Court to file his plea agreement under seal, arguing that the cooperation language in the agreement could subject him to reprisal from other inmates. Goins joined the motion. After extensive discussion with the parties, the Court granted the motion in part, excised the cooperation language from the plea agreements, and filed it under seal as an addendum to the plea agreement. The Government eventually moved to seal the en-

tirety of the plea agreements, which the Court granted.

4. The Trial Defendants were tried on a superseding indictment filed specifically for Trial.

5. Because defense counsel and counsel for the government would be material witnesses, the Court ordered the parties to obtain new counsel for the hearing. The Court appointed John Reed to represent Guyton; Mark Plaisance to represent Goins; Robin Schulberg to represent Henderson; and Stephen Shapiro to represent Berry. Mark Miller and Michael Simpson represented the Government.

hearing memoranda, and this matter is now ripe for consideration.

## II. *Facts Germane to the Pleading Defendants* [6]

Much evidence was adduced over the course of the evidentiary hearing, the vast majority of which consisted of testimony from counsel for the Government and the Pleading Defendants. For purposes of clarity, the Court separates its findings with respect to each Pleading Defendant.

### A. *Guyton*

The Government never directly asked Guyton to testify or to interview with law enforcement. Nor did Guyton ever directly communicate to the Government an unwillingness to honor the cooperation provision in his plea agreement. Rather, the Government's position is based almost exclusively on happenstance conversations between the Trial AUSA's and Guyton's prehearing counsel—Herbert Larson ("Larson") and Sara Johnson ("Johnson"). The Government relies on six incidents to support its position that Larson and Johnson's communications to the Trial AUSA's constituted a breach of the plea agreement by Guyton himself. The Court addresses each incident separately.

#### i. *The Hallway Conversation*

Johnson was present in court on the first day of Trial. The Trial AUSA's did not ask her to attend, nor did Johnson have a scheduled meeting with the Government. Rather, as a young lawyer, Johnson was present solely for the purpose of ob-serving opening statements and improving her advocacy.

While sitting in the gallery of the courtroom, Johnson was informed by Michael Boleware ("Boleware")—pre-hearing counsel for Berry—that, unbeknownst to her, Guyton was being held in the marshall's office. Johnson proceeded to the marshall's office and was informed by one of the marshalls that Guyton refused to cooperate with the Trial AUSA's. After briefly meeting with Guyton, Johnson returned to the courtroom, hoping to speak with one of the Trial AUSA's.

Johnson intercepted the Trial AUSA's [7] during a Trial recess as they were leaving the courtroom (the "Hallway Conversation"). A brief conversation with Lieberman ensued. The two discussed the prospect of Guyton testifying at Trial. At some point, Johnson said something to the effect of, "you're not going to like what he has to say; it's about marijuana." Johnson testified that she then referred Lieberman to a specific conversation between Haines and Guyton, which had been the subject of a previously-filed motion *in limine* (the "Marijuana Motion"). Lieberman and Murphy deny that Johnson referenced the Marijuana Motion, instead interpreting Johnson's statement to mean that Guyton would testify that *all* his interactions with Haines involved marijuana.

#### ii. *The Lafayette Square Conversation*

On May 14, 2014—the second day of trial—Johnson had another conversation with Lieberman. This conversation oc-

---

**6.** The parties presented a substantial amount of evidence regarding conversations that occurred prior to the Pleading Defendants' entry of guilty pleas on May 11 and May 13, 2013. As the Court repeatedly explained on the record during the evidentiary hearing, those conversations have little bearing, if any,

on the ultimate issue before the Court—whether the Pleading Defendants breached their plea agreements *after* their guilty pleas were tendered.

**7.** The record is unclear whether Sims was present.

curred in Lafayette Square [8] during the lunch hour (the "Lafayette Square Conversation") and, like the Hallway Conversation, was not planned. The parties have different recollections of how the Lafayette Square Conversation began. Johnson testified that Lieberman requested her to "think about" asking Guyton to testify at Trial. Lieberman testified that she asked Johnson to clarify the Hallway Conversation, specifically, whether Guyton would testify that all his phone calls with Haines involved marijuana. The rest of the Lafayette Square Conversation is mostly undisputed. Johnson responded to Lieberman's question (whatever it was) by referencing the Marijuana Motion. Lieberman then questioned how Johnson could believe that specific conversation between Haines and Guyton was about marijuana, given that, in her view, the totality of the evidence strongly suggested the conversation was about heroin. Lieberman testified that Johnson responded: "that's his [Guyton's] truth." Johnson does not remember uttering these words.

### iii. *The Gallery Conversation*

On May 15, 2014—the third day of trial—Johnson was present in the courtroom. She sat in the gallery to observe the proceedings. Nobody from the Government had requested a formal meeting, nor had Johnson intended to have such a meeting.

Sims approached Johnson while both were sitting in the gallery. He inquired whether Johnson truly believed that Guyton's interactions with Haines were limited

to marijuana. Johnson stated that she believed her client.[9] In a frustrated tone, Sims again questioned how Johnson could believe this to be true and proceeded to list the evidence that, in his mind, unequivocally proved that Guyton's interactions with Haines involved heroin.

### iv. *The DEA Agent Conversation*

At some point during the plea proceedings on May 4, 2013, a DEA agent asked Larson and Johnson if he could speak with Guyton. The details surrounding this request are ambiguous. For example, the record is unclear which DEA agent spoke with Larson. Agent Brian Mariana ("Mariana") testified that Agent Vincent Saltaformaggio ("Saltaformaggio") spoke with Larson; Larson and Johnson testified the conversant was Mariana. The phraseology of the request is also unclear: Mariana testified that Saltaformaggio asked, "if we were going to be able to speak to Mr. Guyton;" Johnson testified that Mariana pointed towards Guyton and said, "can Igo talk to Marc;" Larson testified that Mariana said, "can I interview your client?" Regardless of the wording of the request, it is undisputed that Larson responded by shaking his head "no."

### v. *The Holding Cell Chatter* [10]

On May 13, 2013—the first day of Trial—May 14, 2014, and May 20, 2014, multiple defendants charged in this case were transported from jail and held in the Court's temporary cellblock.[11] United

---

**8.** Lafayette Square is a quaint public park across from the courthouse.

**9.** The parties offered conflicting testimony as to whether Johnson referenced the Marijuana Motion. Sims testified that the conversation was global and did not reference any specific conversation between Guyton and Haines; Johnson disagreed.

**10.** Although it appears in the Court's factual findings with respect to Guyton, the Holding Cell Chatter is germane to all defendants, as explained more fully *infra*.

**11.** The following defendants were housed in the temporary cellblock on the following days: May 13, 2013—the Trial Defendants, the Pleading Defendants, and Jones; May 14, 2013—the Trial Defendants; Berry, Henderson, Guyton, and McKenzie Weber

States Marshal Milton Ramirez ("Ramirez") was assigned cell block duty on these days during which he overheard the detainees say that they would not cooperate with the Government or testify at Trial (the "Holding Cell Chatter"). Ramirez cannot, however, identify any particular conversations, much less the participants in the conversation.[12] Rather, he testified that the detainees' refusal to cooperate was an "ongoing theme." Ramirez did not immediately report the Holding Cell Chatter to the Government, because, in his experience, it was "standard operating procedure" for defendants to profess an intention not to cooperate with the Government. The first time Ramirez spoke with the Government regarding the Holding Cell Chatter was *after* the Government had filed the instant Motions.

Weber also overheard the Holding Cell Chatter. Unlike Ramirez, however, he reported to McSherry during Trial that Berry, Henderson, and Guyton were not going to cooperate or testify at Trial. Weber testified that Berry was the "leader" of the Holding Cell Chatter.

### vi. *The Grand Jury Conversation*

In mid or late July 2013, Larson telephoned McSherry from Paris, France (the "Grand Jury Conversation"). A lengthy conversation ensued, the substance of which is largely undisputed. McSherry stated that he believed Guyton breached his plea agreement. Larson disagreed, noting that the Government never asked Guyton to debrief or provide testimony. McSherry replied that if Guyton really is willing to cooperate, the Government would call him before a grand jury to testify regarding an ongoing drug trafficking investigation in St. Louis, Missouri. Larson responded that Guyton required a formal grant of immunity from the Attorney General. McSherry did not believe this was necessary, because the plea agreement provided that any truthful information Guyton provided could not be used against him. Larson disagreed. The Government never called Guyton to testify before a grand jury.

### B. *Henderson*

The Government's position that Henderson breached his plea agreement by failing to cooperate is based largely on two incidents. The Court discusses each incident separately.

### i. *The Aborted Debriefing*

On May 11, 2013, McSherry and Murphy traveled to the St. Charles Parish Prison to debrief Berry and Henderson. After meeting with Berry, McSherry and Murphy attempted to meet with Henderson (the "Aborted Debriefing"). John Musser ("Musser")—Henderson's pre-hearing counsel—was present. What happens next is hotly disputed.

McSherry and Murphy contend they spoke directly with Henderson. Specifically, they explained to Henderson that the purpose of their visit was to prepare him to testify at Trial in accordance with his plea agreement. Henderson allegedly displayed some reluctance to debrief with the government, turning his back to the AUSA's and making an exasperated gesture with his mouth.[13] Musser subsequently interjected and asked to speak

---

("Weber")—a co-defendant who had already plead guilty; May 20, 2013—the Trial Defendants, Berry, Henderson, and Weber.

**12.** Ramirez also testified that it was possible that defendants from other cases may have

been held in the cellblock on the days he was present.

**13.** Murphy testified that Henderson made a spitting gesture; McSherry testified that Henderson said "huh."

with his client. McSherry testified that he overheard the ensuing conversation and that Henderson told Musser that he would not testify or cooperate with the Government.[14] Following this brief conferral, Musser stated that the debriefing would likely not be successful that day and that he would reach out to McSherry and Murphy at a later time.

Musser has an entirely different recollection of the Aborted Debriefing. Musser testified that he met with Henderson prior to the arrival of McSherry and Murphy. A few minutes later, McSherry and Murphy stuck their heads in the interview room and asked to speak with Henderson. Musser informed the two that he had only recently arrived and requested to do the debriefing "a little bit later." McSherry and Murphy responded favorably to this request and left the room, after which Musser reviewed with Henderson the factual basis of his guilty plea. Musser remained with his client for approximately one hour, expecting McSherry and Murphy to return for the debriefing. It is undisputed that McSherry and Murphy did not return, nor make any further attempt to debrief Henderson on May 11, 2013. Musser testified that his client never refused to interview or cooperate with the Government.

### ii. *The McSherry–Musser Exchange*

Toward the end of the Government's case-in-chief, McSherry testified to a phone conversation in which he informed Musser that the Government was about to close its case and that McSherry wished to speak with him in person regarding the status of Henderson's cooperation. Following this conversation, McSherry further testified to a brief exchange between he and Musser that took place in the Trial courtroom (the "McSherry–Musser Exchange").[15] Specifically, McSherry testified that he asked Musser whether Henderson "is ... going to cooperate." Musser allegedly responded, "no, he's not going to cooperate." Musser emphatically disputes that the McSherry–Musser Exchange even took place, or that he ever represented to the Government that Henderson would not testify, provide a debriefing, or otherwise comply with the cooperation provision in his plea agreement.

### C. *Goins*

The Government never directly asked Goins to debrief or testify at Trial. Nor did Goins ever directly communicate to the Government an unwillingness to honor the cooperation provision in his plea agreement Rather, the Government's position is based almost exclusively on a brief exchange between Bruce Ashley ("Ashley")—Goins' pre-trial counsel—and Mariana or McSherry (the "Brief Exchange").[16]

It is undisputed that Ashley was present in court during the testimony of Demond Lockhart (a Government witness) and that McSherry approached Ashley at some point during this testimony. Ashley testified that McSherry said, "Bruce, go see if your guy wants to testify." McSherry testified that he said, "I need[ ] to know whether [your] client [is] going to testify." Ashley left the courtroom and met with Goins, who was being held in a temporary cell block in the Hale Boggs building.

Ashley returned to the courtroom approximately ninety minutes later. The

---

14. Murphy did not corroborate this testimony.

15. It is undisputed that Musser attended a few days of Trial in person.

16. As explained *infra,* there is conflicting testimony as to the participants in the Brief Exchange.

parties offer varying recollections as to what happened next. Mariana testified that Ashley requested him to inform McSherry that Goins would not testify. Mariana responded that Ashley should relay this information to McSherry personally. Ashley confirmed the first part of this account, namely, that he approached Mariana and requested him to inform McSherry "that Goins does not want to testify." Ashley disputes, however, that Mariana responded to this statement. Rather, Ashley testified that he left the courtroom immediately after contacting Mariana. McSherry has a different account of the Brief Exchange. He testified that he spoke *directly* with Ashley upon the latter's return to the courtroom and that Ashley stated Goins would not testify.

### D. *Berry*

The Government relies primarily on two conversations between Trial AUSA's and Berry to substantiate its allegation that Berry breached his plea agreement by failing to cooperate. The Court discusses each conversation separately.

#### i. *The First Failed Debriefing*

A few hours prior to meeting with Henderson on May 11, 2013, Murphy and McSherry attempted to debrief Berry. Boleware, Mariana, and Berry were present (the "First Failed Debriefing"). The substance of the ensuing conversation is largely undisputed. Murphy and McSherry introduced themselves and explained the purpose of their visit—to prepare Berry to testify at Trial pursuant to his obligation under the plea agreement. The AUSA's began with some preliminary questions related to Berry's factual basis.

Berry answered those questions truthfully. As Murphy and McSherry began to probe Berry's involvement in the charged conspiracy more in depth, particularly his involvement with the other co-conspirators, Berry became reluctant to answer questions. Eventually, Berry put his head down and said something to the effect of: "I just can't do this." Murphy and McSherry explained the consequences of not debriefing or testifying, including the fact that Berry's plea agreement could be vacated and that he would therefore be facing a significantly higher statutory maximum. Boleware attempted to persuade his client to cooperate with the Government during the First Failed Debriefing but was unsuccessful.

#### ii. *The Second Failed Debriefing*

The Government attempted to secure Berry's cooperation on one other occasion (the "Second Failed Debriefing"). The meeting took place during Trial [17] in an interview room located in the Marshall's office. McSherry, Murphy, Boleware, and Berry were present. As with the First Failed Debriefing, the substance of the Second Failed Debriefing is largely undisputed. McSherry and Murphy met with Berry to prepare him to testify at Trial. Berry was also informed during this meeting that the Trial Defendants intended to call him as a witness. Berry unequivocally refused to testify for either side.[18]

### LEGAL STANDARD

■ Plea agreements are interpreted under general principles of contract law. *See United States v. Ballis*, 28 F.3d 1399, 1409 (5th Cir.1994). Thus, if a defendant has fulfilled his obligations under the plea

---

17. The record is unclear as to when the Second Failed Debriefing took place. Murphy testified that it was likely "several days" into Trial.

18. Murphy testified that Berry stated: "I'm not helping anybody." Boleware testified that Berry said: "I'm not testifying for nobody. I'm not getting on the stand for the Defendants or the Government."

agreement, the Government must perform its reciprocal obligations.[19] *United States v. Davis*, 393 F.3d 540, 546 (5th Cir.2004). Conversely, if a defendant "materially breaches" his plea agreement, the Government may withdraw from the agreement and seek a new indictment on charges previously dismissed. *Hentz v. Hargett*, 71 F.3d 1169, 1176 (5th Cir.1996).

■ A breach is material when it deprives the non-breaching party of the benefit of the bargain. *United States v. Castaneda*, 162 F.3d 832, 837 (5th Cir.1998).[20] Thus, the materiality of a breach is directly proportional to the extent the non-breaching party is deprived of the expected benefits. *See id.* ("The less the non-breaching party is deprived of the expected benefits, the less material the breach.").

The concept of material breach is clarified by comparison with the converse concept of substantial performance: "if a party's nonperformance ... is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, the breaching party has substantially performed under the contract, and the non-breaching party is not entitled to rescission." *Id.* at 837–38 (alteration in original) (internal quotation marks omitted). The Government bears the burden of proving by a preponderance of the evidence both that the defendant breached the plea agreement and that the breach was material. *Id.* at 837.

■ Although a plea agreement is a contract, "[t]he analogy to contract law doctrines is not determinative in the area

---

**19.** *United States v. Ocanas*, 628 F.2d 353 (5th Cir.1980) is not to the contrary. The defendants in *Ocanas* pleaded guilty in exchange for a probated sentence and a promise by the government to dismiss any remaining counts in the indictment. *Id.* at 356. The court deferred acceptance of the guilty pleas pending review of the pre-sentence report. *See id.* Prior to the date of sentencing, and prior to the district court's acceptance of the guilty pleas, the government obtained a superseding indictment and filed a motion to dismiss the original. *Id.* The district court granted the motion, and the defendants proceeded to trial on the new indictment. *Id.* Each defendant was convicted on at least one count. *Id.* The defendants appealed, arguing, *inter alia*, that the government breached the plea agreement by obtaining a superseding indictment. *Id.* at 357–58. The Fifth Circuit disagreed, holding that as "[a]s a general rule ... either party should be entitled to modify its position and even withdraw its consent to the bargain until the plea is tendered and the bargain as it then exists is accepted by the court." *Id.* at 358.

*Ocanas* is factually distinguishable from the case at bar. Whereas the trial court in *Ocanas* deferred acceptance of both the guilty plea and the plea agreement, this Court has already accepted the guilty pleas tendered by the Pleading Defendants. This is not a distinction without difference, as the Supreme

Court made clear in *United States v. Hyde*, 520 U.S. 670, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997). The *Hyde* Court held that when a district court accepts a defendant's guilty plea but defers decision on whether to accept the plea agreement, the "defendant may not withdraw his plea unless he shows a 'fair and just reason' under Rule 32(e)." *Id.* at 671, 117 S.Ct. 1630. If a defendant is not permitted to withdraw his guilty plea willy nilly after acceptance by the district court, it follows *a pari* that the Government should be prohibited from doing so as well. For these reasons, the "general rule" enunciated in *Ocanas* is inapplicable to this case. In fact, as the Fifth Circuit has recognized, the continued precedential value of *Ocanas* has been undermined by the Supreme Court's decision in *Hyde*. *See United States v. Grant*, 117 F.3d 788, 791 n. 4 (5th Cir.1997).

**20.** Although *Castaneda* involved a non-prosecution agreement, courts in the Fifth Circuit have applied *Castaneda's* definition of "material breach" to plea agreements. *See, e.g., Davis*, 393 F.3d at 546–47; *United States v. Mackay*, 37 Fed.Appx. 713, at *4 (5th Cir. 2002); *United States v. Castro*, 118 F.Supp.2d 711, 712–13 (E.D.La.2000); *United States v. Quintanilla*, No. C–02–208 c/w C–05–260, 2007 WL 2461900, at *12 (S.D.Tex. Aug. 26, 2007).

of plea negotiation." *United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir. 1981). This follows from the recognition that a plea agreement is "a contract in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *United States v. Ataya*, 864 F.2d 1324, 1329 (7th Cir.1988); *see also United States v. Martin*, 25 F.3d 211, 216 (4th Cir.1994) ("[P]lea agreements between the government and a defendant are unique and call for special due process considerations."); *Calabrese*, 645 F.2d at 1390 ("Because important due process rights are involved, plea negotiations must accord a defendant requisite fairness and be attended by adequate safeguards to insure the defendant what is reasonably due [in] the circumstances.") (alteration in original) (internal quotation marks omitted); *United States v. Ready*, 82 F.3d 551, 558 (2d Cir.1996) (recognizing that although "[p]lea agreements are construed according to contract law principles. . . . [D]ifferent types of contracts are subjected to different interpretative rules and background understandings.") (first alteration in original) (citations omitted) (internal quotation marks omitted). Against this background, the Court assesses a claim for breach of plea agreement "with greater scrutiny than in a commercial contract." *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir.1997); *accord Ricketts v. Adamson*, 483 U.S. 1, 16, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (Brennan, J., dissenting) ("Unlike some commercial contracts, plea agreements must be construed in light of the rights and obligations created by the Constitution.").

## LAW AND ANALYSIS

The Government relies on four types of communications to carry its burden of proving material breach: (1) communications by defense counsel to the Government where the defendant was not present; (2) communications by defense counsel to the Government where the defendant was present but did not speak; (3) communications by the Pleading Defendants to the Government; and (4) communications between the Pleading Defendants themselves. Because a different legal analysis applies to each type of communication, the Court separates its analysis accordingly.

I. *Communications by Counsel to the Government Where Defendant Was Not Present*

■ With the exception of the Holding Cell Chatter,[21] the Government relies exclusively on communications by defense counsel to prove that Guyton and Goins breached their plea agreements. The Government also cites the McSherry–Musser exchange to demonstrate that Henderson breached his plea agreement. The question presented is one of first impression—whether the communications of counsel can constitute breach of a plea agreement by the defendant himself.

■ The answer depends on the extent to which defense counsel may make decisions without consulting his client. As many courts have recognized, there are essentially two categories of decisions made by a criminal defendant's trial counsel: those that are "strategic" and may be made without a client's consent, and those that are "fundamental" or "personal," which require the client's informed consent. *See United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir.1992) (en banc);

---

**21.** The Court addresses the effect of the Holding .Cell Chatter on the disposition of the instant Motions in Subsection IV.

*Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997); *Sexton v. French*, 163 F.3d 874, 885 (4th Cir.1998); *accord United States v. Chapman*, 593 F.3d 365, 367–68 (4th Cir. 2010). The former primarily involve trial strategy and tactics, such as "what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." [22] *Teague*, 953 F.2d at 1531. As the Supreme Court has recognized, "[t]he adversary process could not function effectively if every tactical decision required client approval." *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Certain decisions, however, are of such constitutional import that they cannot be made for the defendant without his formally informed consent. *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *Taylor*, 484 U.S. at 418–19, 108 S.Ct. 646. The Supreme Court has identified at least four such decisions: whether to plead guilty, waive a jury, testify on one's own behalf, or file an appeal. *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)).

■ One of these decisions—the entry of a guilty plea—is "an event of signal importance in a criminal proceeding." *Nixon*, 543 U.S. at 187, 125 S.Ct. 551. By pleading guilty, a defendant waives several constitutional rights such as the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Such high stakes for "an accused facing death or imprisonment demand[ ]

the utmost solicitude of [the] courts." *Id.* For these reasons, counsel cannot consent to a guilty plea on his client's behalf, nor can a defendant's tacit acquiescence in the decision to plead guilty render the plea valid. *Nixon*, 543 U.S. at 187–88, 125 S.Ct. 551. Rather, the Court must engage the defendant in a comprehensive colloquy on the record to determine the guilty plea is entered with full knowledge of its consequences. *See Boykin*, 395 U.S. at 243, 89 S.Ct. 1709; Fed.R.Crim.P. 11(b).

■ If counsel cannot plead guilty on his client's behalf, it follows that counsel cannot breach the plea agreement on his client's behalf, nor can the client acquiesce in the breach. Like the entry of a guilty plea, the breach of a plea agreement affects a defendant's fundamental rights. For example, the defendant exposes himself to the possibility of (1) a higher maximum sentence of incarceration, (2) re-indictment on new charges, and (3) the use of his factual basis against him as an admission of guilt.[23] Faced with the prospect of such dire consequences, the decision to breach a plea agreement is for the defendant and the defendant alone. Accordingly, when the government alleges material breach, the Court must exercise the utmost scrutiny to determine whether the defendant himself intended to breach his plea agreement.

On the record before it, the Court cannot conclude that any of the Pleading Defendants authorized counsel to breach their plea agreements. Due to issues of attorney-client privilege, counsel were not permitted during the evidentiary hearing

---

**22.** *See also* 3 LaFave, Israel, King, & Kerr, *Criminal Procedure*, § 11.6(a) (3d ed.2013) (listing examples of "strategic" decisions).

**23.** In a recently-issued opinion, the Fifth Circuit suggested in *dicta* that a defendant can waive his rights under Federal Rule of Evi-

dence 410(a) contemporaneously upon the signing of the plea agreement, even if he later breaches that plea agreement and the government withdraws. *See United States v. Escobedo*, 757 F.3d 229, 233–34 (5th Cir.2014). This Court need not decide the issue today.

to discuss their conversations with the Pleading Defendants. Thus, it is impossible for the Court to determine whether the Pleading Defendants sanctioned those communications and whether they intended to breach their plea agreements thereby.[24]

The Government desperately tries to avoid this line of argument by relying on the common law of agency. Specifically, the Government argues that defense counsel is the agent of his client and that therefore counsel's representations to the Government bind the client. In other words, the Government argues that, as agent for the client, counsel can breach a plea agreement without his client's consent. This argument fails for multiple reasons.

■ First, common law agency principles have limited applicability to the relationship between a criminal defendant and his lawyer. In the civil context, when an agent exceeds his authority and binds his principal to a third party, the principal has a cause of action against his agent. Restatement (Second) of Agency §§ 399, 383 cmt. e.[25] Thus, for example, if an agent's actions cause the principal loss, the principal may recover that loss from the agent, thereby making the principal whole again. *Id.* at § 401. No such remedy is available in the criminal context when, for example, counsel breaches a plea agreement without his client's consent. At best, the client has a claim for ineffective assistance of counsel. But the legal standard governing ineffective assistance claims differs drastically from that which governs a civil cause of action for damages.

■ Second, application of common law agency principles would do violence to the well established distinction between "strategic" and "fundamental" decisions. Under the Government's logic, this distinction would be obliterated, as counsel would be authorized to make *any* decision in the course of representation without consulting his client. As explained more fully *supra*, "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Nixon*, 543 U.S. at 187, 125 S.Ct. 551; *accord Taylor*, 484 U.S. at 417–18, 108 S.Ct. 646.

Third, no court has ever applied the law of agency in the context of a criminal prosecution, much less in circumstances similar to the case at bar. To do so would subvert the principle that "[b]y exercising his constitutional right to the *assistance* of counsel, a defendant does not relinquish the right to set the parameters of that representation." *Teague*, 953 F.2d at 1533 (emphasis in original). The Court has painstakingly canvassed and catalogued the decisions in which courts have found a defendant in breach of his plea agreement. Only one of those decisions relied on counsel's representations to establish breach.[26] Every other case involved direct communication by the defendant.[27]

---

**24.** The Court does not mean to suggest that counsel's communications on behalf of his client can't *ever* suffice to prove a breach of plea agreement. But where, as here, there is no affirmative evidence of the client's consent, the Court cannot find breach.

**25.** The Fifth Circuit recognizes the Restatement (Second) of Agency as an accurate reflection of the common law of agency. *See Port Ship Serv., Inc. v. Int'l Ship Mgmt. &*

*Agencies Serv., Inc.*, 800 F.2d 1418, 1420 (5th Cir.1986).

**26.** *See United States v. Terry*, 257 F.3d 366 (4th Cir.2001) (finding breach of plea agreement where counsel presented evidence at sentencing hearing in violation of plea agreement). It must be noted, however, that the defendant in *Terry* was present in court during the presentation of evidence by his counsel.

The Government could have avoided this adverse ruling simply by issuing a subpoena to the Pleading Defendants and directly inquiring whether they intended to honor the cooperation provision in their plea agreements. In response, the Government argues that the Trial AUSAs were busy preparing for Trial and that under such trying circumstances, it was reasonable to rely on the representations of counsel. Unfortunately for the Government, there is no legal support for this position. While the Court's ruling may impose additional burdens when the Government seeks to rescind a plea agreement, those burdens are more-than counterbalanced by the weighty constitutional concerns attendant to rescission. Thus, when assessing the evidence in this case, the focus is not convenience to the Government but rather whether a preponderance of the evidence reveals that the defendant made an intelligent, informed decision regarding his fundamental rights. The Government has not made this showing.

## II. Communication by Counsel to the Government Where Defendant Was Present But Did Not Speak

■ The record only reveals one conversation between defense counsel and the Government where the Defendant was present but did not speak—the Aborted Debriefing. To be sure, the parties dispute whether Henderson actually spoke to or otherwise communicated with McSherry and Murphy. In order to make a finding, the Court would be forced into the uncomfortable position of making a credibility call between lawyers. Having thoroughly reviewed the testimony of McSherry, Murphy, and Musser, the Court can find no reason to credit one lawyer's testimony over the other's. With the evidence in equipoise, the Government has failed to carry its burden of proving that Henderson communicated directly with

**27.** See, e.g., United States v. Davis, 393 F.3d 540 (5th Cir.2004) (finding breach where defendant deliberately withheld information when speaking with government); Hentz v. Hargett, 71 F.3d 1169 (5th Cir.1996) (finding breach where defendant informed prosecutor that he would not testify consistent with statements provided in debriefing); United States v. Ataya, 864 F.2d 1324 (7th Cir.1988) (finding breach where defendant directly informed AUSA on multiple occasions that he would not testify as a government witness, despite being warned that failure to testify constituted breach of plea agreement); United States v. Wood, 780 F.2d 929 (11th Cir.1986) (per curiam) (finding breach where defendant lied to FBI during debriefing); United States v. Gonzalez–Sanchez, 825 F.2d 572 (1st Cir.1987) (finding breach where defendant either gave false information to FBI agents or gave perjured testimony as a government witness); United States v. Williams, 510 F.3d 416 (3d Cir.2007) (finding breach where counsel and defendant argued during sentencing hearing for downward departure in violation of plea agreement); United States v. Lezine, 166 F.3d 895 (7th Cir.1999) (finding breach where defendant repeatedly lied to government agents and also during plea colloquy); United States v. Tilley, 964 F.2d 66 (1st Cir.1992) (finding breach where defendant provided false testimony at multiple hearings); United States v. Embree, 262 Fed.Appx. 499 (4th Cir.2008) (finding breach where defendant provided false information to officers during debriefing); United States v. Espinosa–Jimenez, 159 Fed.Appx. 680 (6th Cir.2005) (finding breach where defendant lied to Government during proffer); United States v. Castro, 118 F.Supp.2d 711 (E.D.La.2000) (finding breach where defendant informed prosecutor that he would not testify consistent with statements provided during debriefing); United States v. Brumfield, No. 12–190, 2013 WL 4007088 (E.D.La. Aug. 5, 2013) (finding breach where defendant informed government agents that he would not cooperate or testify in the trial of a co-defendant and made statements to government inconsistent with his factual basis); United States v. Feliciano, 787 F.Supp. 846 (N.D.Ill.1992) (finding breach where defendant lied during debriefing).

McSherry and Musser.[28] *Cf. Flaks v. Koegel,* 71 Civ.1901, 1978 WL 1075, at *3 (S.D.N.Y. Mar. 31, 1978) (finding plaintiff failed to carry burden of proof where testimony of two witnesses conflicted and record did not provide basis for making credibility determination).

The parties do not dispute that Musser communicated directly with McSherry and Musser in the presence of Henderson during the Aborted Debriefing. The parties also do not dispute that Musser requested the debriefing take place at a later time and that neither McSherry nor Musser protested. These uncontested facts do not support the Government's position for multiple reasons.

▮▮▮ Assuming *arguendo* that Henderson's presence during and lack of objection to Musser's communications at the Aborted Debriefing constitute approval of those communications, such that the Court may treat them as emanating from Henderson himself, the communications do not constitute a breach of the plea agreement. The plea agreement requires Henderson "to submit to interviews whenever and wherever requested by law enforcement authorities." This language, however, is subject to a few important qualifications. Plea agreements are strictly construed against the Government, *United States v. Purser,* 747 F.3d 284, 290 (5th Cir.2014), and, like all contracts, should be interpreted in a manner that avoids absurd results. *See United States v. Ramos,* 537 F.3d 439, 452 (5th Cir.2008); *United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986). Holding Henderson to the literal terms of this plea agreement—to submit to interviews "whenever and wher-

ever requested"—would certainly produce absurd results. For example, surely the parties could not have intended that Henderson submit to interviews in the middle of the night without warning or while juggling tennis balls and standing on one leg. It would be similarly unreasonable to require Henderson to debrief without first being afforded opportunity to prepare with his counsel. Indeed, a requirement to the contrary would likely violate Henderson's Sixth Amendment right to have counsel present at all "critical" stages of a criminal proceeding, which includes the plea bargaining process. *See Lafler v. Cooper,* —— U.S. ——, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398 (2012); *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1408, 182 L.Ed.2d 379 (2012).[29]

It is undisputed that Musser requested additional time to confer with his client. After McSherry and Murphy assented to this request, Musser reviewed the factual basis with Henderson in private. Musser waited for the AUSA's to return, but they did not. Because Henderson was entitled to a brief continuance of his debriefing in order to consult with counsel, he did not breach his plea agreement.

▮▮▮ In the alternative, even if Henderson breached his the plea agreement, the breach was not material and therefore does not warrant rescission. In order to establish material breach, the Government must prove that Henderon's request for a brief continuance of his debriefing deprived the Government of the benefit of the bargain. *Castaneda,* 162 F.3d at 837. With respect to cooperation, the bargain is set forth in the following provision of the plea agreement:

---

**28.** As the old baseball adage goes, "tie goes to the runner."

**29.** Once the Sixth Amendment right to counsel attaches, the Government bears a "heavy burden" of demonstrating the defendant knowingly and intentionally waived that right. *See United States v. Johnson,* 954 F.2d 1015, 1020 (5th Cir.1992).

The defendant's plea of guilty is predicated upon the fact that the defendant agrees to submit to interviews whenever and wherever requested by law enforcement authorities. The defendant understands he must be completely truthful. The defendant also agrees to appear before any Grand Jury or trial jury and to testify truthfully. The defendant understands if he is not truthful, this agreement will be null and void and defendant may be prosecuted for perjury or making false statements. The defendant agrees neither to implicate anyone falsely nor to exculpate or protect anyone falsely. The defendant further agrees to immediately advise the Government as to any person defendant believes to be violating the law and defendant agrees to assist the Government with regard to the investigation and prosecution of criminal conduct.

The plea agreement imposes four affirmative obligations on Henderson: (1) to submit to interviews when requested by the Government,[30] (2) to provide truthful testimony during those interviews and before any tribunal, (3) to advise the Government of any unlawful activity known to the defendant, and (4) to assist the Government with ongoing investigations. *See Brumfield,* 2013 WL 4007088, at *5 (interpreting virtually identical cooperation provision in plea agreement). While the Government may have experienced a slight delay in realizing these benefits, it was certainly not wholly deprived. The Government could have attempted to reach out to Henderson either later during the day on May 11 or on a future date. Indeed, at the end of the Government's case-in-chief, McSherry contends he asked Musser whether Henderson was "willing" to testify (the McSherry–Musser Exchange). Assuming *arguendo* this conversation occurred,[31] it demonstrates the Government still believed it could benefit from the cooperation requirement in the plea agreement. Given the foregoing, Henderson's breach was not so substantial as to be considered material. *See Castaneda,* 162 F.3d at 837 ("The less the non-breaching party is deprived of the expected benefits [of the plea agreement], the less material the breach.").

 In the further alternative—that is, if Henderson materially breached his plea agreement—the Government is estopped from seeking rescission. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases," *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), and is recognized as part of the federal common law. *Robertson–Dewar v. Mukasey,* 599 F.Supp.2d 772, 783 (W.D.Tex.2009). An equitable estoppel claim has three elements: "(1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change in position to one's detriment because of the reliance." *Johnson v. Seacor Marine Corp.,* 404 F.3d 871, 878 (5th Cir. 2005).

Each of these elements is present. McSherry and Murphy did not immediately object to Henderson's request to continue the Aborted Debriefing. Given the foregoing, it was reasonable for Henderson to believe the Government "was not insisting on, and was therefore giving up" its right to require cooperation at that particular moment.[32] *See* Samuel Williston, *Wil-*

---

**30.** As discussed *supra,* this requirement is subject to a reasonableness requirement.

**31.** Musser denies the McSherry–Musser Exchange took place.

**32.** Again, the Court assumes *arguendo* that the failure to immediately debrief constituted a breach of Henderson's plea agreement.

liston on Contracts § 39:29 (4th ed.2014). Moreover, Henderson undoubtedly relied on the conduct of McSherry and Murphy to his detriment. Had Henderson been aware the Government intended to rescind his plea agreement, he would have at least had the opportunity to cure his material breach and avoid the life-altering consequences that would result from rescission.

### III. Communications by the Pleading Defendants to the Government

■ Despite a five-day evidentiary hearing, the record reveals only two instances in which the Government spoke directly with a Pleading Defendant: the First Failed Debriefing and the Second Failed Debriefing. Berry refused to debrief at the First Failed Debriefing and, during the Second Failed Debriefing, unequivocally informed the Government that he would not testify at Trial. Berry is clearly in breach of his plea agreement. Nonetheless, Berry argues that rescission is inappropriate under the doctrine of substantial performance. As evidence of his substantial performance, Berry notes that he (1) assisted the Government by providing contact information for his sister, who eventually testified at Trial, (2) induced Henderson and Jones to plead guilty, and (3) offered to convince the Trial Defendants to plead guilty.

■ A defendant has substantially performed, thereby rendering any breach of his plea agreement immaterial, if his "nonperformance ... is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by [his] performance." Castaneda, 162 F.3d at 838 (first alteration

in original). Berry did not substantially perform, because his conduct at the First and Second Failed Debriefings thwarted the purpose of his plea agreement. The primary benefits the Government contracted for and reasonably expected from the plea agreement were full cooperation in ongoing criminal investigations and truthful testimony as a government witness. By refusing to debrief and later refusing to testify at Trial, Berry deprived the Government of these benefits. Moreover, any "assistance" Berry rendered to the Government provided meager benefits at best and certainly did not wholly dwarf his breach of the plea agreement. Quite the contrary, Berry's breach wholly dwarfed his performance.[33]

Even if the Court finds a material breach, Berry argues the appropriate remedy is not rescission.[34] In support of this argument, Berry seizes on the following provision in the plea agreement: "The defendant understands if he is not truthful, this agreement will be null and void and defendant may be prosecuted for perjury or making false statement." Berry argues that the only remedy available to the government is prosecution for perjury or making false statement. Because he neither perjured himself nor lied to the Government, Berry argues the Government is without remedy for any other breach of the agreement. This argument fails for multiple reasons.

■ First, Berry's interpretation of the plea agreement runs contrary to the basic principles of contract law. Plea agreements must be read as a whole and given a reasonable interpretation. Brown,

---

33. That the Government ultimately obtained a conviction against the Trial Defendants does not make Berry's breach any less material. See Davis, 393 F.3d at 547; Gonzalez–Sanchez, 825 F.2d at 580; United States v. Scruggs, 356 F.3d 539, 544 (4th Cir.2004).

34. Berry adopted by reference the argument made in Goins' post-trial memorandum. For purposes of this Order, the Court treats this argument as if made by Berry himself.

801 F.2d at 354. By limiting the Government's remedies to situations in which he is untruthful, Berry essentially abnegates all other obligations in the plea agreement. For if there is no remedy for breach, the obligation is no longer an obligation *per se* but merely a suggestion, which the defendant can violate with impunity. Surely the parties could not have intended such an absurd result when the plea agreement was executed.

■■■■■■ Second, that the plea agreement does not provide a specific remedy for breach of certain obligations does not imply that there are none. In such situations, "the remedies for breach are commonly supplied simply by reference to the applicable law of contracts." *Ballis*, 28 F.3d at 1410. "[C]ancellation [is] a traditional remedy for breach of contract ... available to the Government when the defendant breaches his plea agreement." *United States v. Cimino*, 381 F.3d 124, 129 (2d Cir.2004). Moreover, all courts agree—including the Fifth Circuit—that a defendant's material breach of a plea agreement frees the Government from its reciprocal obligations under the plea agreement. *See, e.g., Ballis*, 28 F.3d at 1409 ("[I]f a defendant materially breaches his commitments under a plea agreement, the government is released from its obligations under that compact and may bring a new indictment on previously dismissed charges, regardless of what it may have promised earlier."); *Calabrese*, 645 F.2d at 1390 ("It is clear that a defendant's failure to fulfill the terms of a pretrial agreement relieves the government of its reciprocal obligations under the agreement."); *Gonzalez–Sanchez*, 825 F.2d at 578 ("[I]f the defendant fails to fulfill his promises [under the plea agreement], the government is released from its agreement and may indict and try the defendant regardless of whatever it may have promised earlier."); *United States v. Kelly*, 337 F.3d 897, 901 (7th Cir.2003) ("[A] defendant's substantial breach of an unambiguous term of a plea agreement frees the government to rescind the deal."); *United States v. Sandoval–Lopez*, 122 F.3d 797, 800 (9th Cir.1997) ("Where a defendant has breached a plea agreement, courts have found the government to be free from its obligations."); *United States v. West*, 2 F.3d 66, 69 (4th Cir.1993) (finding that defendant's breach of a plea agreement "relieves the government of its obligation to conform to the agreement's terms.").

Third, depriving the Government of a remedy in this case would have a deleterious effect on the plea bargaining system.[35] As discussed *supra*, defendants would have little incentive to comply with the obligations in their plea agreement. This in turn would disincentivize the Government from engaging in plea negotiations in the first place.

## IV. *Communications Between the Pleading Defendants Themselves*

The Government cites the Holding Cell Chatter as evidence that the Pleading Defendants did not intend to honor the cooperation provision in their plea agreements. This contention need not detain the Court very long. As Ramirez explained, such braggadocio among defendants in holding cells is "standard operating procedure." Accordingly, the Holding Cell Chatter has little, if any, probative value of whether

---

**35.** As the Supreme Court has noted, "criminal justice today is for the most part a system of pleas, not a system of trials." *Lafler*, 132 S.Ct. at 1381. Indeed, the disposition of a criminal case by guilty plea "conserve[s] valuable prosecutorial resources" and affords defendants an opportunity "to admit their crimes and receive more favorable terms at sentencing." *Frye*, 132 S.Ct. at 1407.

the Pleading Defendants intended to cooperate pursuant to their plea agreements. Moreover, the Government cites no case, nor can this court find any, for the proposition that unprompted, spontaneous conversations between criminal defendants are competent evidence of an anticipatory breach.

## CONCLUSION

The Court, the lawyers, and the parties have expended a considerable amount of time and resources litigating these Motions. The Government could have cushioned this blow by subpoenaing the Pleading Defendants and proffering their testimony outside the presence of a jury. Instead, the Government largely chose the circuitous route of relying on stale, disputed conversations between attorneys. What followed was a five-day evidentiary hearing during which the Court heard from everyone in this case except the Pleading Defendants themselves. As explained *supra*, the ultimate decision to breach a plea agreement is for the defendant and the defendant alone. Absent some affirmative evidence of approval by the defendant, the Government cannot impute the representations of counsel to the defendant himself. The Government has failed to marshal such evidence with respect to Guyton, Goins, and Henderson. Accordingly, their plea agreements shall remain intact.

Unlike the other Pleading Defendants, Berry communicated directly with the Government. Unfortunately for Berry, his forthrightness is his downfall. The Government has proved by a preponderance of the evidence that Berry materially breached his plea agreement with full knowledge of the consequences of his actions. Accordingly, his plea agreement is vacated.